UNITED STATES of America,
Plaintiff–Appellee,

v.

Sandra ALAMO and Francisco Hernandez, Defendants–Appellants.

Nos. 88–1902, 88–1903.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 13, 1989.

Decided April 13, 1989.

Jay Paul Deratany, Thomas J. Piskorski, Seyfarth Shaw Fairweather & Geraldson, Chicago, Ill., for defendants-appellants.

Stephanie L. Uhlarik, Asst. U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before WOOD, Jr., POSNER, and COFFEY, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

The two defendants, Sandra Alamo and Francisco Hernandez, at all times prior to trial made it abundantly clear that they wanted to be represented by the same trial counsel. After extensive colloquy with the trial judge their request for joint counsel was allowed. However, now after conviction each defendant claims that the allowance of their prior joint counsel demand resulted in the denial of effective assistance of counsel. That is the principal issue on appeal although each defendant additionally raises one or more minor issues.

## I. FACTUAL BACKGROUND

Factually, this is no more than the typical efforts of the parties, one an undercover agent, to conclude a cocaine transaction which resulted in arrest. Sergeant Clarence Travis was a veteran Chicago police officer assigned to the Drug Enforcement Administration (DEA) Task Force. It begins when Sergeant Travis posing as a dealer along with a confidential informant met with Manuela Gomez [1] and Blanca Garcia,[2] both unknown to Sergeant Travis, to

---

1. Gomez was indicted as a coconspirator along with Alamo and Hernandez, but pleaded guilty under a plea agreement and is not involved in this appeal.

2. Garcia is not involved in this appeal.

arrange a purchase of cocaine. The price for the kilo of cocaine was $26,000, which Sergeant Travis represented he had. After meeting they all drove to the home of Francisco Hernandez who was indicated to be the cocaine source, but he was not there. They then unsuccessfully looked for him elsewhere, but separated until Gomez could get "her act together." Gomez finally contacted Hernandez. She then notified Sergeant Travis that she had the cocaine, which she did not, and asked him to meet her at a particular location. Gomez then again went to the home of Hernandez. This time he was home. Sandra Alamo was also present. Hernandez agreed to see if he could get the cocaine and instructed Gomez to meet him later at another location.

In the meantime Sergeant Travis had driven to the location as first directed by Gomez. A car came by driven by Hernandez with Alamo in the front seat and with Gomez and Garcia in the back. Gomez got out and told Sergeant Travis that the driver was the supplier and that Alamo was his wife. Gomez wanted to go to a different location to conclude the transaction. Sergeant Travis refused. The Hernandez car then pulled alongside and Alamo asked why the delay. Finally, they agreed to meet at the new location.

Upon arriving there Alamo came to Sergeant Travis for the money. There was an argument about how the money-cocaine exchange was to be accomplished with the result that the transaction was terminated and the parties separated. A short time later Gomez again contacted Sergeant Travis by phone about trying to conclude the sale. After Hernandez spoke directly to Sergeant Travis they again agreed to meet. Alamo arrived by car at the specified location along with Gomez and Garcia. Alamo and Gomez got in Sergeant Travis' car and

Gomez was allowed to count the money. Alamo left to call Hernandez to tell him that it was finally arranged. She returned and got back in their car with Gomez and Garcia. A few minutes later Hernandez showed up on a motorcycle, took out the cocaine package from inside his jacket, and gave it to Gomez to give to Sergeant Travis. Sergeant Travis then moved to take the money out of the trunk of his car. By a prearranged signal backup agents put an end to the whole affair. Hernandez tried to get away on his motorcycle but it jumped the curb and tipped over. It was just not his day. All were arrested.

## II.  LEGAL PROCEEDINGS

Defendants Alamo and Hernandez, along with Gomez, on August 7, 1987 were charged in a five-count indictment with conspiring to knowingly and to intentionally possess with intent to distribute cocaine and knowingly and intentionally distribute cocaine, in violation of Title 21, United States Code, Section 846 and also with knowingly and intentionally distributing approximately 1000.53 grams of a mixture containing cocaine, in violation of Title 21, United States Code, Section 841(a)(1).[3]

At their arraignment before Judge Rovner on August 14, 1987 and again later, two weeks prior to trial, on February 16, 1988 the matter of each defendant being represented by the same attorney, Richard Kagan, was raised, extensively considered, and reconsidered by Judge Rovner. On each occasion, pursuant to Federal Rule of Criminal Procedure 44(c)[4] Judge Rovner very carefully explained the joint representation problems and engaged in an extensive dialogue with the defendants and their joint attorney about the ramifications of that representation. In addition, Judge Rovner explored the competency of each

---

**3.**  The remaining counts charged Gomez alone with violations of Title 21, United States Code, Sections 843(b) and 844(a).

**4.**  Fed.R.Crim.P. 44(c) provides that
  whenever two or more defendants have been jointly charged and are represented by the same counsel,

the court shall promptly inquire with respect to such joint representation and shall personally advise each defendant of the right to the effective assistance of counsel, including separate representation. Unless it appears that there is good cause to believe no conflict of interest is likely to arise, the court shall take such measures as may be appropriate to protect each defendant's right to counsel.

defendant to fully understand the proceedings and the seriousness of the charges. She carefully explained the possible conflicts that could be caused by dual representation: that it might at times inhibit the ability of their attorney to cross-examine government witnesses, that it would prohibit the attorney in final argument from trying to place the blame on only one of the defendants, that it would prohibit the attorney from engaging in post-trial negotiations with the government as to full disclosure by one defendant against the other, and that it would prohibit the attorney from arguing to the sentencing judge the relative culpability of the defendants. Judge Rovner advised that judges strongly recommend against dual representation. She further advised that a court-appointed lawyer was available to represent either of them, or to confer with them about the dual representation situation.

Attorney Kagan was asked by Judge Rovner how he would propose to represent both defendants to avoid the possible problems. He explained that he had examined the government's evidence and discussed it all in great detail with each defendant. Also he represented to Judge Rovner that there would be no conflict within the defenses of his two clients; that they did not have opposing defenses; that each defendant's acts were independent, separate parts of the alleged conspiracy; that their defenses were not "finger pointing defenses;" and also that there did not appear to be any information that either of the defendants had or might have already disclosed or would disclose that would incriminate or implicate the other defendant that the government did not already have. Judge Rovner went over it all with each defendant and came to the conclusion that each defendant understood the problems, and that each persisted in waiving any right to separate attorneys. This was reduced to separate written waivers fully setting forth possible joint representation problems. Mr. Kagan discussed these written waivers

with his clients as did Judge Rovner before a waiver was executed by each defendant.

On each of these two occasions this joint representation problem was all gone into meticulously and extensively. In the course of these proceedings Judge Rovner made certain statements on each of the two occasions which the defendants now highlight as error. At the August 14, 1987 hearing, Judge Rovner said in part, "It is your case, your situation, and you have the responsibility of making the final decision." Later, at the February 10, 1988 hearing Judge Rovner further stated, "If that is your decision, it is your decision. Again, I tell you it is a decision this Court cannot agree with, but must accept." Judge Rovner then accepted the waivers and the case proceeded to trial with Mr. Kagan representing both defendants. Both defendants were found guilty.[5] Both defendants seek a reversal, or a new trial. We grant neither.

### III. ANALYSIS OF DUAL REPRESENTATION ISSUE

■ Both defendants make the same complaint and argument about the joint representation that they continually wanted in advance of trial, but now, after conviction, claim to be error.

All recognize that the Sixth Amendment to the Constitution requires that a defendant be afforded the effective assistance of counsel free of conflicts of interest. *Glasser v. United States*, 315 U.S. 60, 76, 62 S.Ct. 457, 467, 86 L.Ed. 680 (1942). The conviction was reversed in *Glasser* because Glasser's attorney was appointed, over Glasser's objection, to also represent a co-defendant. It was clear that the dual representation in the particular circumstances of that case impacted adversely upon the joint attorney's representation of Glasser. In the present case, however, there was no objection as both defendants actively sought representation by Mr. Kagan, and there was no adverse impact.

---

**5.** Defendant Alamo was sentenced to five years imprisonment followed by five years probation. Defendant Hernandez was sentenced to a total of six years imprisonment followed by a four-year period of supervised release.

In *Holloway v. Arkansas*, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978), the trial court appointed the same counsel to represent three codefendants over their objection that there was a conflict of interest that would deprive them of effective assistance of counsel. It was held that the joint attorney's request on behalf of the defendants for appointment of separate counsel based on his representations regarding conflict of interest should have been granted. That counsel, the court noted, was in the best position professionally and ethically to make the conflicts determination. In the present case the joint attorney, Mr. Kagan, was in the same position as counsel in *Holloway*, except he had been privately retained by Alamo and Hernandez, not court-appointed. Mr. Kagan made definite representations to the court that no conflicts existed or could be foreseen.

*Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), is cited by defendants, but in that case the trials of the codefendants were separate, and Sullivan did not object. The court found that a "defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." 446 U.S. at 348, 100 S.Ct. at 1718. In the present case there was not only no objection to joint representation, but a continued active and informed support for it, in spite of the voiced concerns of Judge Rovner.

This court has found a conflict of interest in certain circumstances. *United States ex rel. Williams v. Franzen*, 687 F.2d 944 (7th Cir.1982). In the present case, however, counsel for defendant Alamo argues that the joint representation conflict caused Alamo not to testify in her own defense. Whether or not a defendant is to testify is a fundamental decision to be made in any criminal case. As defendants' joint counsel knew in advance what the government's case was expected to be, and what the defense would be, so far as any defense existed, the decision that neither defendant would testify cannot be necessarily blamed merely on the joint representation. The foregoing review of the involvement of each defendant in the cocaine transaction, illuminated by the testimony of government witnesses including Sergeant Travis and the testimony of coconspirator Gomez about the involvement of both Alamo and Hernandez, suggests that there was little else Mr. Kagan could advise his clients. Furthermore, in this case, before the defense rested, Judge Rovner, outside the presence of the jury, carefully explained to each defendant the right to testify or not to testify, and further explained that if they chose not to testify that it could not be commented on to the jury. Both defendants informed Judge Rovner that they did not choose to testify. What personally helpful testimony either defendant might have offered is difficult to perceive considering the circumstances of their participation in the transaction.

As can be seen from Mr. Kagan's opening argument to the jury it was the defense strategy on behalf of both defendants to place the blame on Gomez, the cooperating codefendant, and on Garcia, not called by the government. This was to be accomplished by cross-examination of the government witnesses, and by pointing out gaps, weaknesses and inconsistencies in the government's case. We will not second-guess with hindsight experienced defense counsel's strategy when faced with a strong government case.

It is further claimed that neither defendant knowingly and voluntarily waived the right to separate counsel. Judge Rovner found both defendants to be competent, understanding and capable of making the counsel decision, which they did. We have already seen Judge Rovner's painstaking care evidenced in the court discussions along with written waivers. No trial judge could possibly have done more to insure that the waivers were knowingly and voluntarily made.

Counsel for both defendants strongly urge that *Wheat v. United States*, 486 U.S. 153, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988), decided after this present case had been heard by the district court, dictates reversal. The Supreme Court held that a district court possesses the discretionary power to require multiple defendants to

retain separate counsel. It is argued in the present case that Judge Rovner wrongly believed, however, that she had to accede to the wishes of the defendants without the exercise of any discretion on her part. This argument is based on Judge Rovner's comments at each of the hearings that it was the defendants who had the responsibility to make the final decisions, and that if they chose to be represented by the same counsel it was a decision that the court could not agree with, but must accept.

The language used by Judge Rovner lends itself to that interpretation, and the defendants argue that had she realized it was her decision and not the defendants, she would have required separate counsel. The government argues, however, that the language is also subject to another interpretation. It was simply an expression by Judge Rovner, the government urges, which reflected nothing more than that the district court may have believed defendants' decision to assert their constitutional right to counsel of their choice to be an unwise one, but that she would go along with it in view of their persistent demands. We cannot say Judge Rovner did not exercise discretion in so doing. In view of the great care Judge Rovner used in permitting the joint representation we will not reverse these convictions because of a few ambiguous sentences she used.

*Wheat* considered joint representation in a drug distribution conspiracy, and affirmed the decision of the trial judge not to permit an attorney, already the attorney for two other codefendants, to also represent Wheat. The joint representation request was made by the defendants only two days before trial. The possibility of conflict was strong since one of the codefendants represented by the attorney had already pleaded guilty and was expected to testify against Wheat. The other codefendant represented by the same attorney had already been acquitted on one charge and was endeavoring to negotiate a plea agreement on remaining charges. The proposed plea agreement had not yet been accepted by the trial judge. The possibility remained that Wheat and the second codefendant, in the event of trial, would be in

conflict. Wheat was considered a possible witness against this codefendant. Those were definite and specific conflict potentials. *Wheat* held that the district court's refusal to permit Wheat to use the counsel of the two other codefendants was within its discretion, and did not violate Wheat's Sixth Amendment rights. *Wheat* sums up the rule:

> Other district courts might have reached differing or opposite conclusions with equal justification, but that does not mean that one conclusion was "right" and the other "wrong." The District Court must recognize a presumption in favor of petitioner's counsel of choice, but that presumption may be overcome not only by a demonstration of actual conflict but by a showing of a serious potential for conflict. The evaluation of the facts and circumstances of each case under this standard must be left primarily to the informed judgment of the trial court.

108 S.Ct. at 1700.

Had Judge Rovner, in effect, not recognized the presumption in favor of the defendants' counsel of choice and in her discretion not permitted joint counsel we would expect to be now reviewing the reverse claim. These defendants undoubtedly would be now arguing that in not allowing them counsel of their choice that their Sixth Amendment rights had been violated. The potential for being "whipsawed" in these circumstances is apparent. *See Wheat,* 108 S.Ct. at 1698. In this present case the request was not made on the eve of trial as in *Wheat* but was a continuing demand from arraignment to trial. No actual recognizable conflicts, real or potential, could be identified, only the usual general conflict possibilities which ordinarily exist. Those general possibilities are not by themselves necessarily enough to deny defendants their desired joint representation. Even the government could not point to a specific conflict during the pre-trial discussions. In these circumstances the defendants' informed waivers, orally and in writing, were effective. Had Judge Rovner, in the exercise of her discretion, decid-

ed to force one or the other defendants to go to trial with an undesirable lawyer we would be looking at this same record, except for her final decision. Based on this record, as we now view it, these defendants, in that event, would have had a strong case suggesting an abuse of discretion by Judge Rovner.

In *Holloway*, 435 U.S. at 482–83, 98 S.Ct. at 1177–78, it was recognized that allowing a single defendant's attorney to represent codefendants is not a *per se* violation of constitutional guarantees of effective assistance of counsel. In some cases it may be appropriate, and in "some cases, certain advantages might accrue from joint representation." Justice Frankfurter's dissenting view in *Glasser*, 315 U.S. at 92, 62 S.Ct. at 475, is cited with approval. He wrote that joint representation is a means of avoiding reciprocal recriminations and may provide the strength of a common defense against common attack.

Our view that there was no error in the particular circumstances of this case allowing a common and coordinated defense against a common attack does not mean that this court is granting *carte blanche* approval of joint representation of codefendants in all cases, far from it. It has, however, been approved in certain circumstances. *United States ex rel. Tonaldi v. Elrod*, 716 F.2d 431, 436 (7th Cir.1983). We will give great weight to the decision of the district judge in keeping with the dictates of *Wheat*.

## IV. OTHER ISSUES

■ Hernandez argues that Judge Rovner committed reversible error by improperly instructing the jury regarding prior drug transactions between himself and Gomez. The government elicited testimony from Gomez about several small cocaine acquisitions that she had previously conducted with Hernandez. She had then sold the cocaine to others. That testimony was admitted to show the cocaine working relationship between Gomez and Hernandez and to show their intent, practice, and pattern under Federal Rule of Evidence 404(b).

The court gave a limiting instruction which we view as adequate. There was no error.

■ The defendants also point out that there were some conflicts in the testimony between Agent Travis and Gomez related to various details, ranging from the price discussions to statements concerning where the parties parked. Inconsistencies in the evidence of this nature we leave to the credibility determinations of the jury, absent extraordinary circumstances. *United States v. Noble*, 754 F.2d 1324, 1332 (7th Cir.), *cert. denied*, 474 U.S. 818, 106 S.Ct. 63, 88 L.Ed.2d 51 (1985). There was no error.

■ The last issue claimed by defendants to be error arose when the government sought to elicit from Gomez on direct examination evidence that Hernandez, in repeated contacts with her after indictment, had endeavored to persuade her to take advantage of her plea agreement and to help him by claiming that the cocaine was hers, not his. The government, before its questions to Gomez, advised the court of the good faith basis for its approach to this subject with the witness. Gomez, however, admitted only the contacts with Hernandez, but failed to testify that Hernandez had tried to influence her testimony. It appeared from her testimony that the contacts had all been innocent. At defendants' counsel's request that line of government questioning was terminated and the jury immediately instructed to disregard it. We have no reason to believe the jury disregarded the instruction and not the line of questioning. *See United States v. Mealy*, 851 F.2d 890, 903 (7th Cir.1988). The responses of Gomez that were stricken, however, only showed that Hernandez had not tried to influence the witness. There was no error.

## V. CONCLUSION

Finding no reversible error the convictions of both defendants are affirmed.