**Kelvin L. HOLMES, Appellant,**

v.

**UNITED STATES, Appellee.**

**Nos. 86–1203, 88–1427.**

District of Columbia Court of Appeals.

Argued May 17, 1990.
Decided Aug. 23, 1990.
As Amended Oct. 10, 1990.

---

David C. Woll, Kensington, Md., for appellant.

David M. Zlotnick, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher, Elizabeth Trosman and J. Edward Agee, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before BELSON and SCHWELB, Associate Judges, and MACK, Senior Judge.

SCHWELB, Associate Judge:

In these consolidated appeals, Kelvin L. Holmes challenges his convictions for assault with intent to kill while armed, assault with intent to rob while armed, both in violation of D.C.Code §§ 22–501, –3202 (1989 & 1990 Supp.), and obstruction of justice (injuring a witness), *id.* § 22–722(a)(5) (1989). He also appeals from the denials of his motion to vacate sentence and motion for a new trial, and further claims that the trial judge should have granted his motion to suppress tangible evidence. Because we agree with Holmes that certain evidence was improperly admitted against him and that the error was prejudicial, we reverse his convictions and remand for a new trial.

## I

## THE FACTS

Wayne G. Fowler, the complaining witness, was a traveling jewelry salesman who took his wares from business to business. He often carried about $70,000 worth of jewelry with him. Fowler testified at trial that on February 28, 1986 at about 9:00 a.m., while he was at his home in the 6000 block of Eastern Avenue, Northeast, he received a suspicious telephone call. The caller, who did not identify himself, asked for "Bob" and then hung up. At about 10:15 a.m., following a ten-minute meeting with his jewelry repair man, Alberto Lopez, who is of Hispanic extraction, Fowler left his house carrying the usual amount of jewelry with him in a display case.

As he was warming up his automobile, which was parked on the street outside, Fowler recognized an antique Studebaker which was moving into a parking space down the street as belonging to one Zachary Hood. Fowler and Hood had met in 1984. Hood was then employed at a beauty salon at which Fowler made regular stops. Later in 1984, Fowler had been kidnapped and robbed of his jewelry. Hood had subsequently been identified as the kidnapper. Fowler suspected that Hood was following him because he knew that Fowler would be testifying against him at his then forthcoming trial.

With these less than reassuring thoughts going through his mind, Fowler soon noticed in his side-view mirror that a black man who was dressed in a dark knit hat and long green overcoat, and who was previously unknown to Fowler, was walking toward Fowler's car at a fast, steady pace. As this man reached the rear of the vehicle, Fowler attempted to drive off. As he did so, the stranger fired a shot from a .38 caliber pistol into the driver's side window. The bullet struck Fowler in the head. Fowler drove a short distance and then stumbled out of the car. Some workmen who were in the vicinity called the police.

Based on Fowler's report, Hood was promptly arrested. Hood acknowledged to the police that he played a role in the

crime, and he identified Holmes as the trigger man. Seeking to cooperate with the authorities in the hope of securing more lenient treatment, Hood agreed to make a telephone call to Holmes and to have it secretly taped by the police. The principal issue in this case relates to the admissibility of the tape recording of the telephone conversation which ensued.

Hood placed the call to Holmes on March 17, 1986. The transcript of the conversation, quoted at greater length below, reveals that Hood and Holmes had some discussion relating to the possible robbery of "three white guys" of cash and cocaine with the help of Holmes' "machine gun." Hood also alluded to the shooting of Fowler, and Holmes responded in rather vague terms. The two men also briefly discussed a mutual acquaintance, as well as Holmes' brother, a former police officer.

Later on the day of the call, Holmes was arrested. With his oral and written consent, police searched the bedroom of Holmes' house in Prince George's County, Maryland, and recovered a green army coat, a blue skull cap, a sawed-off rifle and a clip of ammunition. Fowler, who had remarkably survived the shooting even though the bullet had passed through his head and lodged in the speedometer of his car, identified Holmes at a line-up eight days later.[1]

In addition to Fowler's testimony and the physical evidence, including a .38 caliber bullet recovered from the dashboard of Fowler's car and the taped telephone call, the government presented the testimony of Zachary Hood. Hood said that he was acquainted with Fowler and knew where he lived. He admitted that he had kidnapped and robbed Fowler in 1984. Hood also testified that he and Holmes had been friends since childhood. He claimed that in January 1986, he and Holmes had discussed plans for robbing three white men, for whom Hood had been working, of money and cocaine, and that he and Holmes

had later "cased out" the premises, but he testified that the proposed robbery was never carried out.[2] He stated that on February 24, 1986, he had met Holmes at a laundromat in Maryland and had solicited Holmes to kill Fowler to prevent Fowler from testifying against Hood regarding the 1984 incident. Hood further testified that he had frankly told Holmes that he could not pay him for the proposed murder. He had informed Holmes, however, that Fowler usually carried $100,000 worth of jewelry with him, and perhaps drugs and money as well, and that Holmes could help himself to Fowler's property after making the hit. According to Hood, Holmes agreed to undertake the mission and stated that he would rob Fowler. The two men "cased out" Fowler's neighborhood on February 25 and 27, 1986.

With respect to the attempt on Fowler's life, Hood testified that on the morning of February 28, he and Holmes drove to Fowler's neighborhood in Hood's car. They stopped at a telephone and made a bogus call to Fowler to ensure that he was at home. Hood dialed Fowler's number and then handed the receiver to Holmes, who asked for "Bob" and then hung up. Hood testified that the two of them watched from an apartment building across the street from Fowler's house for a short time, but then proceeded to Hood's car to wait for their intended victim to emerge. They moved the vehicle to a position from which they could observe Fowler's front door.

At about 9:45 a.m. Hood saw a man who appeared to be Hispanic enter the house. The man left about ten minutes later. At about 10:15 a.m., Fowler emerged from the house and got into his automobile. Holmes, who was wearing a long green overcoat and a dark knit skull cap, got out of Hood's car and began walking toward Fowler's. Hood testified that he saw Holmes shoot Fowler through Fowler's car

---

**1.** At the lineup, Fowler testified that he was 85% sure that Holmes was the man who shot him. At trial, when Holmes was the only defendant seated at counsel table, Fowler made a "positive" identification.

**2.** This potential robbery was also discussed in the tape recorded conversation between the two men. *See* page 1265, *infra*.

window and leave the scene running. According to Hood, Fowler's car drove off "as if a dead weight was leaning on the gas pedal." Hood then departed in his own vehicle.

Holmes presented an alibi defense, which was supported by his own testimony and that of Angela Brooks, the mother of his daughter. He also testified that Hood had attempted to recruit him for a variety of criminal ventures, but he denied participating in any of them. Holmes indicated, on the contrary, that he would usually humor Hood, who tried to portray his (Hood's) role as being that of a "big time player." Holmes acknowledged that Hood told him that he was proposing to have a witness "hit," but denied that Hood attempted to recruit him for the job. Holmes denied that, in the taped telephone conversation, he had admitted any involvement in the shooting of Fowler.

## II

## THE PURPORTED ADOPTIVE ADMISSION

■ Holmes contends that the taped conversation between Hood and himself contained inadmissible out-of-court statements of Hood implicating Holmes in the shooting and that its reception in evidence enabled the prosecutor to argue, without adequate foundation, that Holmes had admitted his guilt. The government responds that the motions judge correctly ruled that Hood's statements were receivable as Holmes' adoptive admissions.

According to the transcript, the portion of the conversation leading up to and containing the purported admissions was as follows:

Hood: Now look, do you remember the thing on, um, that I approached you about up at the laundry mat?

Holmes: No, I don't remember that, I don't think.

Hood: Just think ... remember I got out of my car and got in yours and showed you the um—the papers?

Holmes: Yeah.

Hood: That were needed, you know on that, on that.

Holmes: Same thing though—right?

Hood: Right.

Holmes: Yeah.

Hood: Uh, you, you[3] hit him in the head man, but he ain't die.

Holmes: Huh, he did.[4]

Hood: No, he didn't die.

Holmes: Oh, he didn't?

Hood: No.

Holmes: Oh.

Hood: It just went in one side of the head and came out the other.

Holmes: What?

Hood: Yeah.

Holmes: Tried for him, huh?

Hood: Right, and they didn't have enough evidence on me you know ... because nobody saw me in the car.

Holmes: Right.

Hood: So, um—they, I got out on probable cause.

Holmes: Right.

Hood: And ...

Holmes: Now you got what ... and, you gotta go back to a court.

Hood: Yeah, you know I gotta still go back because of the old stuff.

Holmes: Right, right.

Hood: The new thing, um, I think we got away with that ...

Holmes: Right.

Hood: And so, not to worry about that, all right?

Holmes: O.K. (unintelligible).

---

**3.** Holmes testified at trial that he did not hear the word "you." He did, however, stipulate to the accuracy of the transcript. Moreover, Holmes did not testify at the hearing regarding the admissibility of the tape-recording, and his denial came too late to affect the judge's ruling on that question.

**4.** The stipulated transcript of the tape-recording has a period after the word "did." We have, however, listened to the tape, which is in evidence, and are left with the unmistakable impression that Holmes' tone, and a rise in it between "he" and "did," is more consistent with a question mark. Holmes' next response to a related question was likewise a question: "Oh, he didn't?"

Evidence of "tacit" or "adoptive" admissions is replete with possibilities for misunderstanding, and "[t]he cases repeatedly emphasize the need for careful control of this otherwise hearsay[5] testimony." *Skiskowski v. United States*, 81 U.S.App.D.C. 274, 278–79, 158 F.2d 177, 181–82 (1946), *cert. denied*, 330 U.S. 822, 67 S.Ct. 769, 91 L.Ed. 1273 (1947). There are "great possibilities of error" in relying on oral utterances which are supposed to have been heard, understood, and acknowledged by the defendant. *Naples v. United States*, 120 U.S.App.D.C. 123, 126–27, 344 F.2d 508, 511–12 (1964). In *Moore v. Smith*, 14 Serg. & Rawle 388, 393 (Pa.1826), *quoted in* 4 J. WIGMORE, EVIDENCE IN TRIAL AT COMMON LAW § 1071, at 103 (Chadbourn Rev.Ed. 1972), the court, while discussing the somewhat analogous [6] doctrine of acquiescence by silence—*qui tacet consentire videtur*—stated that "[n]othing can be more dangerous than this kind of evidence. It should always be received with great caution." Where, as in this case, the alleged adoptive admission is said to have been made in a context in which the other party to the conversation (here Hood) was attempting to elicit it, there is an especially enhanced potential for misapprehension. *See Mattocks v. Lyman & Cole*, 16 Vt. 113, 119 (1844) (dealing with purported admission by silence), *quoted in* 4 WIGMORE, *supra*, § 1071, at 105–06. Moreover, this is a criminal case in which the defendant's liberty is at stake, and a cautious approach to the reception of evidence of "tacit" admissions [7] is "especially appropriate" under these circumstances. E. CLEARY, McCORMICK ON EVIDENCE § 270, at 800 (3d ed. 1984), and authorities cited at notes 6 & 7. Where a criminal defendant is available to be confronted with an accusatory statement (as Holmes was here available over the telephone), judicial resort to the adoptive admission doctrine may provide "an open invitation to manufacture evidence," *id.*, or to make something out of nothing or very much out of very little.

■ This court has recognized the potential pitfalls of this kind of evidence and has restricted its admissibility. The government contends that the proper standard here is whether a reasonable jury could conclude that the defendant assented to Hood's statements. The correct test, however, is whether a reasonable jury could properly conclude that the defendant *unambiguously* assented to them. As this court stated in *Harrison v. United States*, 281 A.2d 222, 224 (D.C.1971) (quoting *Naples, supra*, 120 U.S.App.D.C. at 126, 344 F.2d at 511),

> Testimony that an accused adopted statements of another person as his own admissions may be admitted in evidence as an exception to the hearsay rule "if it clearly appears that the accused understood and unambiguously assented to those statements."

In *Brown v. United States*, 464 A.2d 120, 123 (D.C.1983), this court repeated the quoted language from *Naples* and *Harrison*, and added (quoting *United States v. Sears*, 663 F.2d 896, 904 (9th Cir.1981), *cert. denied*, 455 U.S. 1027, 102 S.Ct. 1731, 72 L.Ed.2d 148, (1982)) that

> [t]o constitute an admission by silence, the statement must be made in the defendant's presence and hearing, and the defendant must actually understand what

---

5. But for Holmes' alleged assent to them, Hood's remarks during the telephone conversation would obviously be hearsay.

6. Although in the present case Holmes was not silent in response to Hood's remarks, his responses were non-informative and present a similar, though not identical, analytical problem.

7. Evidence of tacit admissions "should be received with caution and only when the conditions upon which it becomes admissible are *clearly* shown to exist." *People v. Aughinbaugh*,

36 Ill.2d 320, 323, 223 N.E.2d 117, 119 (1967) (emphasis added); *see also People v. Kennedy*, 164 N.Y. 449, 456–57, 58 N.E. 652, 654 (1900) (admissions by silence should be received with caution and are competent only when it is clearly established, among other things, that "the person affected hears and fully comprehends the effect of the words spoken"); Gamble, *The Tacit Admission Rule: Unreliable and Unconstitutional*, 14 GA.L.REV. 27 (1979); Note, *Tacit Criminal Admissions*, 112 U.PA.L.REV. 210, 211 (1963).

was said and have an opportunity to deny it.

We affirmed Brown's conviction because "a reasonable jury could conclude from the context of the conversations that appellant *unambiguously* assented to [his codefendants'] statements." *Brown, supra,* 464 A.2d at 124 (emphasis added).[8]

Applying the foregoing principles to the tape-recorded conversation, we are compelled to conclude as a matter of law that no reasonable jury could find that Holmes *unambiguously* assented to Hood's incriminating statements. As we have previously observed, Holmes' response to Hood's remark that "you hit him in the head, but he ain't die" was "huh, he did." This was apparently more a question than a declaration that Holmes was claiming to be aware or believe that Fowler had died. If that response is read together with the very next exchange,[9] it appears that Holmes was not representing himself as having any knowledge of the victim's fate, but was making inquiries about the subject which Hood had introduced. The remaining arguably incriminating statements by Hood, "[t]he new thing, um, I think we got away with that," and "not to worry about that," produced only brief, quiet, one word responses by Holmes—responses consistent with the theory that Hood had committed the crime with a confederate other than

Holmes and that Holmes was listening to Hood and humoring him but saying very little. Holmes' question to Hood, "[t]ried for him, huh?" strongly suggests that he was under the impression that Hood or his confederate had tried to kill Fowler, that Holmes was asking about that attempt, and that Holmes therefore had no knowledge of or connection with it. Indeed, the question "tried for him, huh?" is incompatible with the notion that it was Holmes who did the trying. Holmes' initial inability to recall a meeting at the laundromat at which this all-important "hit" was said to have been planned is difficult to reconcile with the idea that he was implicitly admitting that he committed the crime. We conclude that no jury could reasonably find that Holmes unambiguously assented to Hood's incriminating comments.

Hood, the person who initiated the telephone call for the obvious purpose of eliciting admissions from Holmes, acknowledged on cross-examination, in regard to Holmes' responses about the hit on Fowler, that "[h]e never admitted it. He never denied it."[10] The trial judge remarked at one point that "I have no doubt that [defense counsel] will do a lot with that tape. It seems to me if I were defense counsel, I probably would want the tape in." This assessment, with which we agree, is incompatible with the notion that a reasonable

8. Admittedly, there is language in *Brown* which, if read in isolation, might be viewed as establishing a lower threshold for admissibility. *See* 464 A.2d at 123. Read as a whole and in conjunction with the authorities upon which the court relied, however, *Brown* holds that the judge must make a preliminary determination whether a jury could reasonably conclude that the defendant unambiguously adopted another person's incriminating statement. If the judge answers that question in the affirmative and admits the evidence, then the jury's function is to decide whether it *should* reach the conclusion which the judge has held that it *may* reach, namely, that there was unambiguous assent. To that end, the question should be put to the jury whether the defendant actually heard, understood and unambiguously acquiesced in the statement. *Id.* at 124.

We note that in *Harrison, supra,* 281 A.2d at 224, this court alluded to the "clearly erroneous" standard as being applicable to the determination whether the defendant unambiguously as-

sented to the incriminating statements of another. In the present case, however, we think the problem is not that the judge made a clearly erroneous assessment of the facts, but rather that she appears not to have applied the requirement in our cases that a purported adoptive admission should be admitted into evidence only if a jury could reasonably find that there was *unambiguous* assent to the statement of another.

9. Hood: No, he didn't die.
Holmes: Oh, he didn't?

10. There is some authority for the proposition that, since it is the failure to deny that is significant, an equivocal response to an allegation is receivable as an adoptive admission. *See* McCormick, *supra,* § 270, at 800 and cases cited at note 4. As Professor McCormick has cogently observed, however, "[t]he lack of a satisfactory dividing line deprives the 'equivocal response' theory of much of its validity." *Id.* at 800 n. 4.

juror could have regarded Holmes' remarks as an unambiguous acknowledgment of complicity in the shooting of Fowler.

We recognize that, as the impartial arbiter "on the scene," the motions judge, whose ruling bound the trial judge, was in a position to obtain a feel for the case which is not readily available to an appellate court. We would be loath to second-guess her on an issue of this kind to the extent that the decision to admit the tape was a discretionary one. *See generally Johnson v. United States*, 398 A.2d 354, 361–68 (D.C.1979). In the present case, however, the judge made no finding—nor could she reasonably have done so—that the jury could reasonably conclude that Holmes *unambiguously* assented to Hood's incriminating statements. Accordingly, we conclude that evidence of Holmes' purported adoptive admission was erroneously received.

### III

### THE "OTHER CRIMES" EVIDENCE

*A. The evidence.*

■ Hood testified that in January 1986, he met with Holmes to discuss a planned robbery of "three white guys" who operated a contracting business but also sold cocaine. He related that he and Holmes later went to the prospective victims' place of business to "case it out." Early in the tape recorded telephone conversation, well before the purported adoptive admission was made, Hood again raised with Holmes the subject of the two men's scheme to enrich themselves at the expense of this sinister trio of drug dealers who, as Hood explained in the portion of the tape recording quoted below, were said to be in possession of enticing quantities of cash and cocaine. Indeed, Hood apparently wanted to lure Holmes into bringing his machine gun and attempting to commit the contemplated

robbery immediately, Hood's apparent purpose being to gain points with the prosecutor by arranging Holmes' apprehension by the police in *flagrante delicto* (attempted robbery-style). The relevant portion of the transcript of the telephone conversation reads as follows:

Hood: Remember those three white guys I was telling[?] The thing that we was going to do on Friday—that never went down[?]

Holmes: Oh, at the job.

Hood: Right.

Holmes: Yeah.

Hood: O.K., look, I'm sitting in the office with them right now.

Holmes: What?[11]

Hood: Yeah and look, fifty-thousand dollars and a couple of kilos of cane.

Holmes: In there now?

Hood: In there now, I got, I got a 38, you know—the machine gun you got[?]

Holmes: Yeah.

Hood: You think you might want to bring it out of the house?

Holmes: Huh, not in no daylight, brother.

Hood: Not in the daylight?

Holmes: Hell no, it ain't as small as you think it is, man.

Hood: I am saying you know—I mean you could fit under your coat or something—it ain't that warm out there.

Holmes: Yeah, it ain't that cold neither ... see ...

Hood: I can dig it ... All right look ..

Holmes: Huh.

Hood: O.K. We don't have to do it today, no way, you know.

Immediately after the tape of the telephone call was played, the trial court instructed the jury that evidence in the call "involving other planned criminal activity ... was admitted only for your considera-

---

**11.** It is readily apparent from Holmes' tone on the tape recording that the word "what?" was an expression of amazement and anticipation; Holmes gave the impression that he was quite interested in the subject. In any event, at the very least, the jury might well so find. By contrast, when Holmes later gave the same response, "what" to Hood's remark that "it [the bullet] just went in one side of the head and came out the other," *see* page [1262], *supra,* the word sounded much more like an expression of confusion or of lack of comprehension, and that too is confirmed by the context.

tion as to showing the circumstances surrounding the offense for which the defendant is now on trial ... and you may not consider it as tending to show in any other way the defendant's guilt for the offense for which he is now on trial." *See* Criminal Jury Instructions for the District of Columbia, No. 2.49 (3d ed. 1978). Although the judge did not so instruct the jury,[12] he also expressed the view that the two men's discussion of the planned robbery was relevant to "corroborate the nature of their relationship."

## B. The sufficiency of the incrimination.

We note at the outset that evidence that the accused engaged in criminal acts other than those for which he is on trial is inadmissible to prove his criminal predisposition. *Drew v. United States*, 118 U.S.App. D.C. 11, 15, 331 F.2d 85, 89 (1964). This rule applies to the defendant's prior "bad acts," as long as the misconduct sought to be proved was at least "minimally in the nature of a criminal offense." *Wheeler v. United States*, 470 A.2d 761, 769 (D.C. 1983). The tape recording and Hood's testimony about the "three white guys" project attribute to Holmes misconduct which, in our view, falls within the *Wheeler* standard.

During the taped telephone conversation, Hood first alluded to—and Holmes readily acknowledged—"the thing that we was going to do Friday." In context, this obviously referred to an armed robbery which the two men had intended to carry out only a short time earlier. Hood then tempted Holmes with the possibility of obtaining "right now" "fifty-thousand dollars and a couple of kilos[13] of cane." He mentioned "the machine gun you got" and asked whether Holmes might "want to bring it out of the house" for use in the proposed robbery. Although Holmes declined, he did so because he did not want to expose his weapon "in daylight." Moreover, a jury might well conclude that the tone of Holmes' "what?", *see* note 11, *supra*, betrayed an unseemly interest in and enthusi-

asm for the acquisition by less than honorable means of a windfall in cash and contraband. Hood's testimony at trial to the effect that he and Holmes planned the robbery and "cased out" the premises, when considered together with the tape, depicts Holmes not only as a sinister character but also as an active participant in a specific conspiracy to rob. This was more than minimally incriminating.

## C. Completing the story of the crime.

The government, relying on *Toliver v. United States*, 468 A.2d 958 (D.C.1983), contends that this incriminating discussion on the tape and in Hood's testimony was not "other crimes evidence" at all, and that it was properly admitted "to complete the story of the crime on trial." *Toliver* does not support the government's position.

We held in *Toliver* that evidence of an uncharged crime "arising out of the same transaction or series of transactions as the charged offense is not an extrinsic offense within the meaning of [the *Drew* rule]." *Id.* at 960-61 (citations and internal quotation marks omitted). This analysis, however, had to do with evidence "relevant to explain the immediate circumstances surrounding the offense charged." *Id.* at 960; *see also Green v. United States*, 440 A.2d 1005, 1006–07 (D.C.1982). The term "immediate circumstances," when used in this context, refers to "events so closely related to the charged offense in time and place that they are necessary to complete the story of the crime ... by placing it in the context of nearby and nearly contemporaneous happenings." *Williams v. United States*, 549 A.2d 328, 333 (D.C.1988) (citations and internal quotation marks omitted). We stated in *Toliver* that proof of the immediate context of an offense "is not other crimes evidence because it is too intimately entangled with the charged criminal conduct." 468 A.2d at 960.

The challenged evidence here cannot reasonably be characterized as contemporaneous with the planning or execution of the assault on Fowler. Hood and Holmes al-

---

**12.** No such instruction was requested.

**13.** Roughly four and a half pounds.

legedly discussed the prospect of robbing the three white men in January 1986. The record does not indicate when they purportedly cased out the business, but there is no indication that this event occurred immediately before February 28, 1986, the day Fowler was shot. The taped telephone conversation took place two and a half weeks after the commission of the charged crime.

Nor were the two criminal ventures intimately entangled. Indeed, there was no entanglement, intimate or otherwise. The only connection between the two real or potential crimes was that the same two men allegedly planned one and carried out the other. The decision as to whether the robbery of the three white men was ever to graduate from words to deeds had nothing to do with the entirely separate question whether a "hit" on Fowler would be attempted. Finally, the story of the Fowler shooting would not have been incomplete if there had been no mention in the prosecution's case of the plan to rob the three white men.[14]

### D. The relationship between Hood and Holmes.

■ The government contends, and the trial judge ruled, that the disputed evidence of unrelated bad acts was admissible to prove the nature of the relationship between Hood and Holmes. The theory is that if the two men had conspired or planned to commit other crimes, it was more probable that they collaborated to commit this one. We cannot agree.

The prior (and here less than savory) relationship between alleged co-participants in a criminal venture is not one of the

enumerated exceptions to the rule of *Drew*.[15] That enumeration, however, is illustrative rather than exclusive. *See Drew, supra,* 118 U.S.App.D.C. at 16 n. 10, 331 F.2d at 90 n. 10. Indeed, "there are numerous other uses to which evidence of criminal acts may be put, and those enumerated are neither mutually exclusive nor collectively exhaustive." MCCORMICK, *supra,* § 190, at 558 (discussing Rule 404(b) of the Federal Rules of Evidence).

Nevertheless, it is significant that the District of Columbia follows the "exclusionary" rule, under which "other crimes" evidence is presumptively inadmissible and the prosecutor has the burden of showing that the evidence falls within one or more of the recognized exceptions; we have expressly held our rule to be more restrictive than the comparatively permissive federal rule, in which such evidence is held to be admissible unless it bears solely on criminal predisposition. *Thompson v. United States,* 546 A.2d 414, 424 n. 18 (D.C.1988). Moreover, we have emphasized that our rule

> should not be applied in a parsimonious spirit, and courts must view with a jaundiced eye evidence purportedly offered as relevant to some other issue but in reality bearing wholly or primarily on the defendant's predisposition to commit another similar crime.

*Id.* at 420. "Courts must be vigilant to ensure that poisonous predisposition evidence is not brought before the jury in more attractive wrapping and under a more enticing sobriquet." *Id.* at 420–21.

> Moreover, the decision is hardly a ringing endorsement of the admission of such evidence even in the quite different context of the *Derrington* case. Indeed, the court remarked that the evidence of the plan to commit an uncharged robbery, "while less relevant, was cumulative, *and we are satisfied that the error, if any, was harmless." Id.* at 1338 (emphasis added).

**14.** The government's reliance on our decision in *Derrington v. United States,* 488 A.2d 1314 (D.C. 1985), *cert. denied,* 486 U.S. 1009, 108 S.Ct. 1738, 100 L.Ed.2d 201 (1988), is misplaced. In that case, this court affirmed a conviction after the trial judge had admitted an accomplice's testimony about a conversation with Derrington in which two uncharged proposed robberies were discussed. It appears, however, that the other crimes came up in a single conversation at which the charged robbery was also discussed, so that the challenged evidence was relevant to explain the immediate circumstances surrounding the meeting at which the charged offense was planned.

**15.** The exceptions listed are (1) motive; (2) intent; (3) absence of mistake or accident; (4) common scheme or plan; and (5) identity. *Drew, supra,* 118 U.S.App.D.C. at 16, 331 F.2d at 90.

Evidence designed to show that Hood and Holmes had a criminally-oriented relationship with one another is not so very different from proof that the two of them were predisposed to commit crimes together—in this case, violent crimes. We are therefore reluctant to countenance a broad new *Drew* exception in a case like this one, in which the government is basically arguing that because the two men allegedly conspired with one another before, they probably did so again.

In *Rindgo v. United States*, 411 A.2d 373 (D.C.1980), this court held that, contrary to the view of the trial judge, the prejudice from the testimony of a prosecution witness that he and the defendant had plotted or carried out several robberies and attempts unrelated to the charged crimes "far outweighed any enhancement of [the witness's] credibility" with regard to his testimony about the charged crimes. *Id.* at 377. In *Rindgo*, the government argued that this court should "adopt the so-called inclusionary rule of federal practice which admits all evidence of other crimes relevant to an issue in a trial, except that which tends to prove only criminal disposition." This court neither accepted nor declined the government's invitation, but assumed for the purpose of the case, without deciding, that the evidence was relevant to a legitimate issue, but nevertheless held it to be far more prejudicial than probative.

Since *Rindgo*, this court has explicitly elected to follow the exclusionary approach rather than the more permissive federal one. *Thompson, supra*, 546 A.2d at 424 n. 18. Accordingly, the predicate for the government's request that the court admit the challenged evidence in *Rindgo* is no longer available to it in this case. The implication of *Rindgo* is that relevance of other crimes evidence to the relationship between the defendant and an alleged partner in crime will seldom be sufficiently probative to sustain an exception from the rule of *Drew* for, in a case in which the nature of the relationship was in issue much as it is here, the court found the scale to tip heavily towards prejudice. We now make explicit a point which did not have to be, and was not, expressly articulated in *Rindgo:* there is no general *Drew*

exception for the defendant's relationship with an alleged confederate.

We noted in *Rindgo* that the relationship between the witness and the defendant had already been established by other evidence. 411 A.2d at 377. Similarly, the jury in this case had already heard testimony from Hood that he and Holmes had been friends from childhood and that they had a common friend in prison. Moreover, Holmes both admitted to a police officer (who later so testified) and testified himself that Hood had solicited him to kill a witness in a case pending against Hood, but that he (Holmes) had refused. Thus, the jury was independently aware that Hood and Holmes had a relationship of trust—Hood believed Holmes to be sufficiently trustworthy that he (Hood) could reveal to him his desire to commit murder.

We note that there is case authority holding that in conspiracy cases evidence that the accused had, on other occasions, entered into unlawful agreements with alleged co-conspirators may be introduced for the purpose of showing that the defendant conspired with these same persons on the particular occasion in question. *See, e.g., United States v. Alamo*, 872 F.2d 202, 207 (7th Cir.1989); *United States v. Fields*, 871 F.2d 188, 197 (1st Cir.), *cert. denied,* — U.S. ——, 110 S.Ct. 369, 107 L.Ed.2d 355 (1989); *United States v. Traitz*, 871 F.2d 368, 389 (3d Cir.), *cert. denied,* — U.S. ——, 110 S.Ct. 78, 107 L.Ed.2d 44 (1989). We find these cases distinguishable not only because, as we have noted, the federal inclusionary rule is more permissive than our exclusionary one, but also because conspiracy cases are *sui generis* with respect to the admission of evidence. "In a conspiracy case, wide latitude is allowed in presenting evidence, and it is within the discretion of the trial court to admit evidence which even remotely tends to establish the conspiracy charged." *Nye & Nissen v. United States*, 168 F.2d 846, 857 (9th Cir.1948), *aff'd*, 336 U.S. 613, 69 S.Ct. 766, 93 L.Ed. 919 (1949). *See also Lorenz v. United States*, 24 App.D.C. 337, 381 (1904) ("wide range of evidence" is admissible to prove conspiracy by circumstantial evidence), *cert. denied*, 196 U.S. 640, 25 S.Ct. 796, 49 L.Ed. 631 (1905); *United*

*States v. Apker*, 705 F.2d 293, 298 (8th Cir.) (wide variety of items may be admissible in conspiracy trial; district court has "particularly broad discretion"), *modified on reh'g en banc on other grounds sub nom. United States v. Fitzgerald*, 724 F.2d 633 (8th Cir.1983), *cert. denied*, 465 U.S. 1005, 104 S.Ct. 996, 79 L.Ed.2d 229 (1984). We need not and do not decide whether, in the District of Columbia, the trial judge's broad discretion with respect to the reception of evidence in a conspiracy case would justify the admission of presumptively prejudicial proof of other bad acts. We hold only that the cited decisions in conspiracy cases in other jurisdictions will not be extended to sustain the reception in the courts of the District of Columbia of otherwise inadmissible *Drew* evidence in a case in which the defendant is not charged with conspiracy but with substantive crimes only.

### E. Shedding light on the alleged adoptive admission.

The government contends that the discussion of the unconsummated "three white guys" caper was relevant to explain the context of the adoptive admissions that Holmes was alleged to have made on the tape. Since we have held that the tape recorded conversations were not properly receivable as adoptive admissions, this rationale must fail.

### F. Probative value and prejudicial effect.

Where evidence of uncharged misconduct falls within a legitimate exception to *Drew*'s presumptive rule of exclusion, the trial judge must determine whether the probative value of that evidence outweighs its prejudicial effect. *Thompson, supra*,

546 A.2d at 420.[16] Such a determination is confided to the sound discretion of the trial court. *Id.* at 420; *Rindgo, supra*, 411 A.2d at 377. In the present case, the judge expressed the view that the challenged evidence was more probative than prejudicial.

We conclude, however, that this determination on the part of the trial judge relates to an issue which he should never have reached. Contrary to the judge's apparent view, the "three white guys" evidence was not intimately entangled with the shooting of Fowler, nor was it a part of the "immediate circumstances" of a crime which was committed at a different time and in a different place. Consequently, it was not admissible under the *Toliver* line of authority. We have likewise declined, at least where no conspiracy is charged, to carve out a *Drew* exception which would allow other crimes evidence to be brought before the jury to show the relationship between the defendant and an alleged accomplice. Accordingly, the plan to rob "three white guys" and the availability of a machine gun with which to carry it out could not properly be admitted to establish the relationship between Holmes and Hood. Finally, the evidence was not receivable to place an adoptive admission in its context, for we have taken the issue of the purported adoptive admission out of the case.

Under these circumstances, there was no occasion here for the judge to do any weighing of probative value against prejudicial effect. The evidence should have been excluded as a matter of law.[17]

### IV

### CONCLUSION

■ The erroneous admission of the tape recording permitted the prosecutor to ar-

---

**16.** So far as we can determine, the judge never made the finding, which is required in "other crimes" evidence cases, that the government had established by clear and convincing evidence that the defendant had committed the uncharged crime. *See Groves v. United States*, 564 A.2d 372, 374 (D.C.1989), *modified on reh'g on other grounds*, 574 A.2d 265 (D.C.1990); *Thompson, supra*, 546 A.2d at 421 n. 11; *Ali v. United States*, 520 A.2d 306, 310 n. 4 (D.C.1987). Holmes has not raised this issue, however, and we do not address it.

**17.** We do not believe that our holding can reasonably be characterized as unduly restrictive against the prosecution under the circumstances of this particular case. The prejudicial effect of this evidence—scheming a robbery, casing out the premises, and having a machine gun available to do the deed—substantially outweighed its probative value on any issue here presented other than the quintessentially forbidden one—whether Holmes, independently and together with Hood, was predisposed to commit violent crime. The evidence suggested that, whether or not Holmes was involved in the assault on Fowl-

gue that "Kelvin Holmes in essence admitted that he was the trigger man on that day during that conversation." [18] The discussion of the separate proposed armed robbery with Holmes' machine gun, as well as Hood's testimony on this matter, suggested that Holmes was a dangerous character. This evidence could have permitted the jury to convict Holmes in spite of any doubts as to Hood's credibility or as to Fowler's initially uncertain identification. *See generally Thompson, supra,* 546 A.2d at 419.

The government's case was potentially a strong one. It is hard to explain why Fowler would identify (even, initially, only with 85% certainty) a man whom Hood had set up, and why such apparently incriminating materials would be found in that man's home. Nevertheless, we are unable to say with fair assurance that the jury's judgment in this case was not substantially swayed by the reception of the challenged evidence. *See Kotteakos v. United States,* 328 U.S. 750, 764–65, 66 S.Ct. 1239, 1247–48, 90 L.Ed. 1557 (1946); *Giles v. United States,* 432 A.2d 739, 746 (D.C.1981); D.C. Code § 11–721(e) (1989). Accordingly, the convictions are reversed and the case is remanded for a new trial.[19]

*So ordered.*

er, he was willing to plan and apparently to commit armed robbery on at least one other occasion. Such material has substantial potential for prejudice.

18. To be sure, defense counsel could and did argue the contrary. Under the controlling case law, however, the issue should never have been presented to the jury.

19. In light of our disposition, we need not address most of Holmes' other claims of error, except to hold that the motions judge's ruling that Holmes consented to the search of his home was not clearly erroneous. *See Welch v. United States,* 466 A.2d 829, 843–44 (D.C.1983). Accordingly, the fruits of the search will be admissible at any retrial.

We note that in a motion for a new trial based on "newly discovered evidence," Holmes claimed that since the trial, Hood has admitted, orally and in writing, that he framed Holmes. Although we do not suggest that the denial of this motion was erroneous, our disposition of the case ensures that Holmes will have the opportunity, at any new trial, to cross-examine Hood on the subject and to present any appropriate evidence.

We also hold, contrary to Holmes' assertion, that in light of Hood's testimony that he and Holmes agreed that he would not pay Holmes for killing Fowler and that Holmes had stated that he would rob Fowler, the evidence, viewed in the light most favorable to the prosecution, was sufficient to support a conviction of assault with intent to rob. That charge therefore remains alive in the event of a retrial.