Phillip H. JOHNSON, Appellant,

v.

UNITED STATES, Appellee.

No. 94–CF–902.

District of Columbia Court of Appeals.

Argued Sept. 10, 1996.
Decided Dec. 5, 1996.

Joseph A. Virgilio, Glendale, CA, for appellant.

Pamela D. Huff, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney, and John R. Fisher, Thomas C. Black, and Cathleen Corken, Assistant United States Attorneys, were on the brief, for appellee.

Before STEADMAN, FARRELL, and KING, Associate Judges.

FARRELL, Associate Judge:

Appellant was found guilty by a jury of possession with intent to distribute crack (PWID) cocaine while armed (D.C.Code §§ 33–541(a)(1), 22–3202(a)(1)), possession of a firearm during commission of a dangerous offense (*id.* § 22–3204(b)), and carrying a pistol without a license (*id.* § 22–3204(a)). He contends on appeal primarily (1) that the trial judge erroneously sustained the assertion of the Fifth Amendment privilege by a potential defense witness without inquiring adequately whether the witness faced a realistic threat of prosecution or had waived the privilege by testifying before the grand jury; and (2) that testimony that appellant had a firearm near him but not on his person was insufficient to permit imposition of a mandatory minimum sentence for his drug conviction under the "while armed" provision of § 22–3202(a)(1). The second issue is one we have previously reserved: does "while armed," for purposes of the mandatory minimum sentence provision, include a firearm not physically on the person of the defendant but within his immediate reach as he commits the underlying offense? For reasons set forth, we hold that it does not, and therefore reverse the imposition of a mandatory minimum sentence under § 22–3202(a)(1).[1] Otherwise, we reject appellant's arguments and affirm the judgments of conviction.

## I.

Police officers in an observation post in the 1300 block of Clifton Street, N.W., watched five individuals engage in what appeared to be narcotics sales. Other persons would approach these individuals (who stood well apart from one another) and in each case give them money in exchange for "some sort of narcotic bag." The sellers held the smaller bags in containers such as brown bags and plastic bags. Appellant's brother, Tyrone Johnson, was one of the sellers and had his drugs in a liquor store bag. This activity, involving "twenty five or more" apparent sales, continued for two hours until appellant entered the block driving a dark colored Nissan 300 ZX car. He stepped out of the car and was joined on the sidewalk by the five sellers. Each handed him money, after which appellant opened the passenger-side door of the car. He sat down on the front seat with his feet on the ground and reached down to the floorboard area of the

---

1. Appellant also received a mandatory minimum prison sentence of five years for the § 22–3204(b) offense which he does not independently challenge. The issue of interpretation of § 22–3202(a)(1) is nonetheless of practical importance to him because the mandatory sentences for the two offenses were made to run consecutively.

car. Then he stood up and rejoined the others, giving each of them an unidentified object. The sellers then dispersed along the 1300 block and continued their apparent drug sales.

Appellant stayed near the car for about two hours, occasionally talking with persons including his brother Tyrone. The five sellers again assembled near appellant, and each gave him money as before. Once more, appellant walked to the car and opened the right door, sat down on the passenger seat, and reached down to the floorboard area. He again handed unidentified objects to the five individuals, who then dispersed and resumed the apparent sales.

Appellant left the block on foot briefly with another person, then returned and drove away alone in the Nissan 300 ZX. The police issued a radio alert, and other police officers stopped him shortly thereafter. When appellant could not produce a driver's license or registration, they ordered him out of the car. An officer opened the passenger side door and saw a gun butt sticking out from underneath the passenger seat, its handle facing the door. Appellant attempted to flee the scene but was caught. A search of the jacket he was wearing yielded twelve rocks of crack cocaine. The automatic pistol removed from under the seat held nine rounds of live ammunition.

## II.

■ At trial appellant attempted to call his brother Tyrone as a witness, but the brother asserted the Fifth Amendment privilege. The trial judge, aware of her obligation to avoid if possible a "collision" of this privilege with the defendant's right to call witnesses, *see Wilson v. United States*, 558 A.2d 1135, 1140 (D.C.1989), inquired into the matter. Appellant's counsel initially proffered that she sought to elicit from Tyrone, who owned the Nissan 300 ZX, only that he had "had control and dominion of the automobile" on the day of the alleged crimes; that appellant had had no contact with it either then or "for some period of time"

previously; that at one point during the day Tyrone lent the car to a third person ("Joe"); and that only later in the day did he ask appellant to retrieve the car from this person and return it to Tyrone. The proffered testimony was intended to buttress appellant's defense that it was "Joe," not appellant, who was at the scene of the drug sales and resupply in the Nissan car, and that appellant acquired possession of the car only shortly before his arrest.

On further inquiry, the judge learned that Tyrone Johnson had testified essentially along the lines of this proffer before the grand jury, prompting appellant's counsel (and the prosecutor) to assert that he had waived his privilege against self-incrimination as to this testimony. In response to further questioning by the judge, however, appellant's counsel revealed that she wanted to elicit considerably more testimony from Tyrone Johnson:

> Furthermore, I would, of course, like to ask him whether he was aware of any drugs [or pistol] that might have been on or about the automobile, or on or about the person who took possession of the car.... And, finally, ... I would like to ask him whether he, in conjunction with anyone else, engaged in any kind of narcotics transactions that day, and also whether he engaged in any kind of activity with my client, consisting of talking with him on the street, on or about the vicinity of the individuals that were around the automobile.

The court had appointed counsel to represent Tyrone Johnson. After reading his grand jury testimony and talking with him, the attorney asserted that Johnson's answers to these questions by appellant's counsel would differ materially from his grand jury answers and would tend to incriminate him. The judge, after herself reading the grand jury testimony, agreed that Tyrone Johnson had legitimate reason to fear self-incrimination by answering these questions, and concluded that nothing short of a blanket assertion of the Fifth Amendment privilege would protect him.[2]

---

2. Initially, the judge appeared to conclude that Tyrone Johnson's testimony before the grand jury

had not waived the Fifth Amendment privilege as to any testimony because he had not been ade-

Relying upon *Ellis v. United States,* 135 U.S.App. D.C. 35, 416 F.2d 791 (1969), a decision binding on this court, appellant argues that the judge erred in not ruling that Tyrone Johnson had waived his privilege by testifying before the grand jury. *Ellis* held that

> where a non-indicted witness has waived his Fifth Amendment privilege by testifying before a grand jury voluntarily and with knowledge of his privilege, his waiver extends to a subsequent trial based on an indictment returned by the grand jury that heard his testimony.

*Id.* at 49, 416 F.2d at 805. *Cf. Tomlin v. United States,* 680 A.2d 1020, 1022 (D.C. 1996) (adopting "the reasoning of *Ellis* " as to indicted witness as well). Appellant's argument would have merit if all he had sought to elicit from his brother was the information contained in his counsel's initial proffer, because our own review of the transcript reveals that Tyrone Johnson gave nearly identical testimony to the grand jury.[3] But as counsel's continued proffer made clear, she intended to go well beyond the scope of the grand jury testimony in questioning Johnson. Those questions and the cross-examination they would inspire—about Johnson's precise activities at the scene of the apparent drug sale, and whether he had sold drugs that day—exceed the scope of any arguable waiver. *See Ellis,* 135 U.S.App. D.C. at 49, 416 F.2d at 805 (waiver not applicable "to any question that would require disclosure of new matter of substance"); *Tomlin,* 680 A.2d at 1022 (to come within waiver doctrine, questioning must "not broach a topic not testified about earlier"). The government's evidence already placed Tyrone Johnson at the scene in active, inferentially drug-related association with appellant. Truthful answers to the additional questions created a realistic, even

obvious, danger of self-incrimination to him. *See Zicarelli v. New Jersey State Comm'n of Investigation,* 406 U.S. 472, 478, 92 S.Ct. 1670, 1675, 32 L.Ed.2d 234 (1972); *Hoffman v. United States,* 341 U.S. 479, 486–87, 71 S.Ct. 814, 818, 95 L.Ed. 1118 (1951). *See also Carter v. United States,* 684 A.2d 331, 337 (D.C.1996) (en banc) ("only the possibility, not the probability, of prosecution is controlling in determining whether to uphold a witness' privilege against self-incrimination").

■ Appellant is thus left with the argument that at least those questions contained in the original proffer and additional questions about Tyrone's knowledge that no drugs or a gun were in the car should have been allowed because the privilege had been waived as to them or they were "innocuous" from the standpoint of self-incrimination. Assuming, for argument's sake, that these questions should have been allowed (and cross-examination correspondingly restricted),[4] that does not help appellant. In part, any answers Tyrone Johnson gave to these questions would have been cumulative of testimony appellant adduced from other witnesses. The fact that Tyrone owned the Nissan was not disputed. And the fact that someone other than Tyrone or appellant (*i.e.,* "Joe") had had the car in the afternoon and early evening of January 29 until shortly before appellant's arrest was attested to by four defense witnesses besides appellant himself. While testimony by Tyrone that he had had no guns or drugs in the car at the time he lent it to "Joe" would not have been cumulative, its exculpatory value in disassociating appellant from the gun and drugs hours later in favor of the phantom "Joe" (whose name, address, and destination with the car Tyrone did not know) was slight at best.[5] Given the strength of the govern-

quately advised by his then-attorney of the self-incriminating risks of testifying. Ultimately, however, the judge sustained the assertion of the privilege on the broader ground stated in the text.

3. At the least, in those circumstances, appellant would be entitled to a remand for a ruling by the judge—which she ultimately pretermitted—on whether Tyrone had knowingly and voluntarily testified before the grand jury within the meaning of *Ellis.*

4. While Tyrone had told the grand jury that he did not have a gun in the car when he lent the vehicle to "Joe," he was not asked specifically before the grand jury whether any drugs were in the car at the time.

5. As a grand juror asked Tyrone Johnson, "Do you make a habit of letting people use your car that you don't know their last name, don't know where they live, and don't know where they're going, but they're going to use your car?"

ment's evidence, any hypothetical error in the judge's refusal to let Tyrone be questioned about these matters was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

### III.

■ Appellant contends that he was wrongly sentenced to a mandatory minimum prison term under the "while armed with" provision of D.C.Code § 22–3202(a)(1), because a jury could not rationally find that he had the firearm in question on his person while committing the drug offense. The government argues in response that actual physical possession of the gun was unnecessary: as long as appellant was in immediate proximity to the gun while possessing the drugs with intent to distribute, he was "armed with" the gun within the meaning of § 22–3202(a)(1), including its mandatory provision. The issue presented is one we reserved in *Morton v. United States*, 620 A.2d 1338 (D.C. 1993), namely:

> whether "while armed with," as distinct from "having readily available," may include a firearm not physically on the person of the defendant for purposes of mandatory [minimum] sentencing under § 22–3202(a)(1).

*Id.* at 1342.

D.C.Code § 22–3202(a)(1) provides:

> (a) Any person who commits a crime of violence, or a dangerous crime in the District of Columbia when *armed with or having readily available* any pistol or other firearm (or imitation thereof) or other dangerous or deadly weapon (including a sawed-off shotgun, shotgun, machinegun, rifle, dirk, bowie knife, butcher knife, switchblade knife, razor, blackjack, billy, or metallic or other false knuckles):

> (1) *May*, if such person is convicted for the first time of having so committed a crime of violence, or a dangerous crime in the District of Columbia, be sentenced, in addition to the penalty provided for such crime, to a period of imprisonment which may be up to life imprisonment and *shall*, if convicted of such offenses *while armed with* any pistol or firearm, be imprisoned for a mandatory-minimum term of not less than 5 years.... [Emphases added.]

In specifying when a defendant may (indeed, must) be sentenced to the mandatory five-year minimum term, the statute thus makes pivotal the distinction between "while armed with" and "having readily available." In *Abrams v. United States*, 531 A.2d 964 (D.C. 1987), the court explained that this distinction was not inadvertent: it reflects "a legislative decision to narrow the class of persons who must receive a minimum sentence, in contrast with the class for which the trial court has discretion to impose a life sentence." *Id.* at 971.[6] To receive a mandatory minimum sentence, a "single perpetrator must actually have been 'armed'; it is not enough for this purpose that the defendant had a gun 'readily available.'" *Id.*[7] In *Morton, supra*, this court observed that "[w]hile we had no occasion in *Abrams* to 'delineate the precise contours of this distinction,' we implicitly recognized that any extension of the concept of 'actually' being armed beyond actual physical possession of the firearm would have to be extremely narrow." 620 A.2d at 1341 (quoting *Abrams*, 531 A.2d at 971). We did not decide in *Morton* whether "any extension" of that kind was legitimate. The defendant's seizure there "within arm's length" of a gun depended on the "coincidence" that the police had "arrest[ed his] movement" that close to the gun rather than "five to ten feet" away. *Id.*[8] Treating his

---

**6.** This narrowing extends also to the nature of the firearm, which may not be an "imitation thereof" to support the mandatory minimum sentence.

**7.** *Abrams* itself dealt not with a "single perpetrator" but with the issue of whether an unarmed aider and abettor could receive the mandatory minimum so long as the person abetted concededly was. Finding "no reason not to apply accomplice liability in this context," 531 A.2d at

971, the court answered that question affirmatively.

**8.** When the police entered the apartment room, the defendant and another man began "'darting around as if they were confused about the sudden presence of police officers.'" Appellant then started moving toward the gun, which lay atop a television set, but was stopped. 620 A.2d at 1339, 1341.

(fortuitous) proximity to the gun when stopped as actual physical possession, we were concerned, would "assimilat[e] the concepts of 'armed with' and 'having readily available.'" *Id.* We pointed out that "[o]n its face the phrase 'armed with' is ambiguous on . . . whether it may include a weapon within arm's reach of the defendant, but not on his person," and we held that, "[a]t least on these facts," the defendant must receive the benefit of that ambiguity under traditional principles of lenity, and thus could not receive the mandatory minimum. *Id.* at 1341–42.

The government points to other language in *Morton* in which we acknowledged the "force" of its argument "that a gun within arm's reach of the defendant may be as accessible to immediate use as a gun, say, stuffed in his pocket or strapped to his leg." *Id.* at 1341. It argues that, unlike in *Morton,* appellant's arrest in immediate company with the gun was not fortuitous: earlier he had twice sat down on the seat of the car and reached to within inches of the gun as he retrieved drugs used to resupply his sellers. "The only way he could have had closer proximity to the gun," the government says, "would have been if it had been in his hand while he sat there, distributing the drugs, a difficult physical act for anyone. The pistol was located in the nearest place appellant could have put it during his re-supply operation."

■ We accept the government's factual premise that a jury reasonably could find that appellant had kept the loaded gun inches from the drugs he twice retrieved from the car floor. Even so, we reject its argument that on those facts appellant was "armed with" the pistol. We hold that "while armed with" under § 22–3202(a)(1) means actual physical possession of the pistol or other firearm.

In urging the contrary, the government argues that the statute cannot reasonably have meant to distinguish between a gun lying on a table inches from the defendant's hand and one kept in his pocket or on his lap (hence "on" his person). In either case, assuming the defendant's intent is to have the gun "at hand" for use if needed, a lay observer would say that he has armed himself with it. But the reason the observer would say so is the commonsense one that in either case the gun is easily or *readily* available to the defendant's grasp, and it is impractical to quibble over whether the gun was "on" him. This commonsense equivalence between "armed with" and having "readily available" underlies the discretionary life-sentence provision of § 22–3202(a)(1). But it does not explain the distinction underlying the mandatory-sentence provision, for precisely the disjunction between those two concepts sets that provision apart. The government therefore invokes another distinction by which a gun lying within arm's length or "immediate" reach of the defendant is subsumed under the armed-with category, while a gun outside that range though still (more or less) readily accessible is not. Yet the statute on its face does not recognize this amalgam of armed-with and readily (in the sense of immediately or instantly) available. It is a hybrid that, as we stated in *Morton,* threatens to "substantially assimilat[e]" the two statutory concepts, 620 A.2d at 1341, despite the legislative intent to keep them apart.

Allowing "armed with" to include possession beyond actual physical possession would create a "line-drawing problem," *Bailey v. United States,* — U.S. —, —, 116 S.Ct. 501, 509, 133 L.Ed.2d 472 (1995), much like the one that persuaded the Supreme Court in *Bailey* to limit the reach of a federal gun statute prohibiting "use" of (in addition to carrying) a firearm during commission of other crimes. The Court held that "use" meant "active employment" of the weapon. *Id.* at —, 116 S.Ct. at 509. In doing so it rejected a gloss that would have made the term include "the inert presence of a firearm" such as one "conceal[ed] . . . nearby to be at the ready for an imminent confrontation," *id.* at —, 116 S.Ct. at 508, because the task of limiting that extension would be "impossible": "How 'at the ready' was the firearm? Within arm's reach? In the room? In the house? How long before the confrontation did [the defendant] place it there? Five minutes or 24 hours?" *Id.* at —, 116 S.Ct. at 509. A similar definitional problem, only slightly less acute, besets the govern-

ment's attempt to equate some instances of ready availability with physical possession. Is the line to be drawn at inches or feet from the defendant, and, if the latter, how many? Does it include bending or stretching to reach the gun, or preclude a lunge or a few steps that will bring the gun quickly within grasp? And do obstructions count? Is, for example, a gun kept inches from the hand but in a closed (unlocked) briefcase the equivalent of a gun kept several feet or more away but with direct, unimpeded access to it?

Judge King would hold, *post* at 210, that if a gun is "instantly" available for use by the defendant, then he is armed with it. But if we remove the affective or emotional content from that word (as in "come here instantly!"), it is merely a synonym for immediate, unimpeded accessibility, *i.e.,* ready availability to a high degree. If, for example, a gun on the desk in front of the defendant is "instantly" available to him, why not the gun in the drawer at his knee, or on the credenza behind him? Other than an instant or two and inches, what distinguishes the reach for a gun on the bucket seat next to the driver from the reach for a gun on the floor below that seat or on the back seat? In short, how does the trier of fact differentiate degrees of availability in a way that avoids arbitrary, impressionistic results from case to case? Merely to say that access must be instant does not solve the definitional problem, nor does asking whether the gun is as available for use "as it would have been if it had been on the person." *Post* at 210.

That problem is only heightened when the defendant is convicted of an underlying possessory offense (such as PWID) continuing over a period of time, and when he therefore may have been in close proximity to the gun at some moments but not others. Appellant's case aptly illustrates. He was inferably within inches of the gun twice when he leaned down to retrieve drugs from the floor of the car; but even the government concedes that he was not armed with the gun (as distinct from having it readily available) when minutes later he was arrested driving the car and carrying drugs on his person— the gun then being at some remove from him. Since appellant was never seen with

the gun on his person, at what point was he armed with it? For the government's argument, it is decisive that he was *seen* next to the gun twice, but that fact seems less important—because more happenstantial—than the fact that he kept the gun near his stash and within easy reach (*i.e.,* readily available) if the stash were endangered. In *Morton, supra,* we faced a nearly identical problem of line-drawing and resolved it against the government's reading of "armed with" on the facts of that case. But *Morton,* like this case, demonstrates the broader problem of equating armed-with and close proximity to a gun when that equivalence may depend on no more than the fortuity of the defendant's movements while committing the underlying crime.

In *Morton,* we concluded that "[o]n its face the phrase 'armed with' is ambiguous on the precise issue of whether it may include a weapon within arm's reach of the defendant, but not on his person." *Id.* "[W]here there is ambiguity in a criminal statute"—"when choice has to be made between two readings" of the legislative intent—"doubts are resolved in favor of the defendant." *United States v. Bass,* 404 U.S. 336, 347, 348, 92 S.Ct. 515, 522, 523, 30 L.Ed.2d 488 (1971) (citation and internal quotation marks omitted). Section 22–3202's exclusion of a "readily available" firearm from the reach of the mandatory minimum clause creates substantial doubt whether that provision was meant to reach forms of possession other than actually having the gun on the person. Lenity thus compels us to resolve that doubt in favor of a restrictive reading of "armed with." While Judge King may be right that this reading will seem odd in marginal applications, that is inherent in the legislative decision to treat two very similar situations so differently in terms of consequences. *Abrams, supra.* The legislature, of course, is free to express its intent otherwise.

Since there was no evidence from which the jury fairly could find beyond a reasonable doubt that appellant had the gun on his person while possessing the drugs with intent to distribute, his mandatory minimum

sentence under § 22–3202(a)(1) must be vacated.[9]

## IV.

■ Appellant goes farther, however, and argues that he could not be sentenced under the discretionary maximum portion of § 22–3202 either, because the indictment charged only that he possessed the cocaine "while armed" with a firearm, not while having it "readily available"; and, according to the verdict form, the jury found him guilty "[a]s to the charge of possession with the intent to distribute cocaine *while armed*" (emphasis added). Our conclusion as a matter of law that appellant was not "armed with" a firearm thus makes the statute inapplicable altogether, in his view. Appellant is in error.

■ For purposes of the discretionary maximum provision of § 22–3202(a), the concepts of "when armed with" and "having readily available" are interchangeable. No legal consequence flows from a jury's finding (or a grand jury's charging) one rather than the other; ready availability is a surrogate for actual physical possession. A finding that the defendant was armed with the firearm, therefore, need not rest on evidence of physical possession to permit enhancement of the maximum sentence. *See Morton,* 620 A.2d at 1340. And while the jury was not instructed on the meaning of "having readily available," no instruction of the kind was requested and, in any event, the failure was harmless beyond a reasonable doubt in view of the compelling circumstantial evidence that appellant kept the gun on the floor next to the drugs he used to resupply his sellers. *Cf. Abrams, supra,* 531 A.2d at 973.

Accordingly, the judgment of conviction for possession with intent to distribute cocaine while armed is reversed and the case remanded for resentencing on that count without reference to the mandatory minimum provision. In all other respects, the judgments of conviction are

*Affirmed.*

KING, Associate Judge, concurring and dissenting:

The court today holds that a drug dealer operating from a stash of crack cocaine who "kept [a] loaded gun inches from the drugs" in the stash, was not, as a matter of law, "armed with" that weapon during those instances when he retrieved contraband from the stash to resupply his street sellers. See *ante* at 205. Because I believe that in these circumstances this is a question of fact for the jury to resolve, and because I am satisfied that a reasonable jury could find on these facts that the drug dealer was "armed with" the weapon, I dissent from Part III of the court's opinion. In all other respects, I join the opinion of the court.

There are two statutory provisions involved here. One allows the sentencing judge to impose a sentence of up to life imprisonment on an offender who commits certain specified offenses "when armed with or having readily available" certain dangerous weapons which includes various kinds of firearms or imitations thereof, as well as weapons having a blade and those intended for use as a bludgeon or to disfigure. D.C.Code § 22–3202(a) (1996 Repl.). The other provision, and the one directly applicable here, calls for, in addition to the possible life sentence, a mandatory-minimum five-year sentence if the underlying crime was committed by the offender while "armed with" a pistol or firearm that is not an imitation, *i.e.,* a real pistol or firearm. D.C.Code § 22–3202(c) (1996 Repl.). No other kinds of weapons are specified. There is no serious dispute, and the court, in effect, so holds in Part IV, that when the defendant retrieved drugs from the stash with the pistol inches

---

9. In 1989 the Council of the District of Columbia bypassed an opportunity to erase or relax the pivotal distinction when it amended § 22–3202 in another respect not relevant here. Instead, it created a new offense, D.C.Code § 22–3204(b), which subjects "possession" of a firearm during commission of a crime of violence or dangerous crime to a mandatory five-year prison term. As we explained in *Thomas v. United States,* 602

A.2d 647, 654 (D.C.1992), possession under the new statute is "a broader concept" than either "armed with" or "readily available" under § 3202. Appellant was convicted separately under this statute and received the required mandatory minimum sentence. Our holding therefore will not deny the government a mandatory minimum sentence of five years in cases such as this.

away, the firearm was "readily available" to him, thereby satisfying the provision that would allow a sentence up to life imprisonment. The majority also holds, however, that these circumstances are insufficient to satisfy the "armed with" provision which carries a mandatory-minimum sentence. The majority concludes that "armed with" is limited to those circumstances where the defendant has "actual physical possession" of the firearm. In my view, that interpretation is too restrictive.

In deciding that "armed with" means "actual physical possession," my colleagues reject the government's argument that the "armed with" provision "cannot reasonably have meant to distinguish between a gun lying on a table inches from the defendant's hand and one kept in his pocket or on his lap (hence 'on' his person)." *Ante* at 205. The majority responds that where a defendant has a "gun 'at hand' for use if needed, the lay observer would say that he has armed himself with it" whether the weapon was in his grasp or whether, although not on the defendant's person, the weapon was readily available for use by him. In short, the argument goes, there is a danger that the jury would blur the two concepts, effectively deciding there was no difference between the scope of "readily available" and "armed with," a notion we have rejected on at least two occasions. *See Morton v. United States*, 620 A.2d 1338 (D.C.1993); *Abrams v. United States*, 531 A.2d 964 (D.C.1987). The majority is also concerned that accepting the government's argument would create a "line-drawing problem." *See Bailey v. United States*, — U.S. —, —, 116 S.Ct. 501, 509, 133 L.Ed.2d 472 (1995). In my view, neither rationale is a sufficient basis for not

adopting the interpretation offered by the government.

I begin my analysis by noting that there is virtually nothing in the legislation itself, or in any of our cases,[1] to guide us in determining what is meant by the term "armed with." The provision was added by voter initiative in 1983, and there is no legislative history. *See Abrams, supra,* 531 A.2d at 966 n. 3. Nor does the statute provide any definitions of its operative terms. The *Abrams* court recognized, however, that, at minimum, "armed with" was a narrower concept than "readily available." *Id.* at 971. The only clue to the meaning of "armed with" is found in those portions of the statute setting forth the description of the weapons covered by each separate provision. The life sentence section, *i.e.*, "readily available," applies for "any pistol or other firearm (or imitation thereof) or other dangerous or deadly weapon. . . ." Section 22–3202(a).[2] On the other hand, the mandatory sentence provision is limited to those "armed with any pistol or firearm. . . ." Section 22–3202(a)(1). Thus, the "armed with" provision only applies where the weapon is a real pistol or firearm (as opposed to an imitation), while the life sentence provision applies to a wide variety of weapons, many of which are intrinsically less lethal than the weapons specified in the "armed with" provision. This difference suggests to me that the mandatory-minimum sentence provision was intended to cover only the most dangerous of circumstances: an offender capable of causing serious harm or death to another by the instant employment of a real firearm.

A weapon would be available for "instant employment," of course, under the majority's definition, *i.e.*, where the weapon was in the offender's hand, in the belt or a coat pocket,

---

**1.** Although there are no cases directly on point, the United States Court of Appeals, in some old cases, at least one binding on us, has held that the term "immediate actual possession" in the robbery statute, 22 D.C.Code § 22–2901 (Supp. III 1970) means "an area within which the victim could reasonably be expected to exercise some physical control." *United States v. Spears*, 145 U.S.App. D.C. 284, 293, 449 F.2d 946, 955 (1971); *Spencer v. United States*, 73 App. D.C. 98, 99, 116 F.2d 801, 802 (1940). That definition would result in a far broader scope of coverage than what is proposed here, and is, therefore, not

particularly helpful in resolving the question before us.

**2.** The weapons specified in that section are "any pistol or other firearm (or imitation thereof) or other dangerous or deadly weapon (including a sawed-off shotgun, shotgun, machine gun, rifle, dirk, bowie knife, butcher knife, switchblade knife, razor, blackjack, billy, or metallic or other false knuckles)." D.C.Code § 22–3202(a) (1996 Repl.).

or on a seated offender's lap. These would be examples of "actual physical possession." In my view, a weapon would also be available for instant employment when a drug dealer was selling from a stash located on a table in front of him with a real firearm immediately next to the stash, the hypothetical suggested by the government. It would also include a dealer, selling from an automobile, with a real firearm on the seat beside him ready for instant use. The offender with a real firearm on the seat beside him, or on the table in front of him, is no less dangerous than the same offender who has the same firearm on his lap, or in his belt or pocket. Under the majority's formulation, however, the latter would be "armed with" the firearm, but the former would not. I submit that such a result is blind to the reality of the kind of behavior that is dangerous and that which is less so.[3] If the purpose of this law is to punish most severely the offender who poses the greatest threat to the public, and I think that is a fair reading of the "armed with" provision read as a whole, then it should include, within its scope, all offenders who are, in fact, the most dangerous, including those who can come by their firearm as quickly as if the firearm were on their person, as well as those who are in actual physical possession of the firearm.

Applying that definition would not, contrary to what the majority suggests, necessarily result in a jury deciding that there is no difference between the scope of "armed with" and "readily available"; nor would it present intractable line-drawing problems. The first concern can easily be remedied by an instruction to the jury along the lines of: "the term 'armed with' means that the firearm is as instantly available to the offender for use as it would be if it were actually on his person." This instruction is fairly simple of application and juries regularly are asked to decide cases based on instructions like this one. As a matter of course, we presume that juries will follow the instructions that they receive. *See Harris v. United States,* 602 A.2d 154, 165 (D.C.1992) (en banc).

Further, we should not be deterred from adopting this definition because of any concerns about line-drawing. Courts wrestle with a wide variety of difficult line-drawing questions every day. One particularly troublesome example, similar to what we face here, is the case involving a defendant charged with possession of something that is not on his or her person, *i.e.,* the so-called constructive possession case.[4] The fact that constructive possession cases are often difficult to analyze, and often do not appear to square with each other, does not make us throw up our hands and say that because of the problems with line-drawing in those cases, we will define possession to mean only actual physical possession.[5] Instead we deal with each fact pattern as it comes to us, resolving some in favor of the accused and some for the government. The same process could apply for the "armed with" provision, although I would expect that there will be far fewer such cases than would be encountered on the question of constructive possession.

In sum, because there are no compelling reasons for not adopting the definition sug-

---

**3.** A firearm located in a deep pocket or strapped in some hard-to-reach place on the body would be in the offender's "actual physical possession" but could be less instantly available than the firearm in the "on the table" or "on the seat" examples cited above.

**4.** *See Earle v. United States,* 612 A.2d 1258 (D.C. 1992); *In re T.M.,* 577 A.2d 1149 (D.C.1990); *Curry v. United States,* 520 A.2d 255 (D.C.1987); *United States v. Holland,* 144 U.S.App.D.C. 225, 227, 445 F.2d 701, 703 (1971) (Tamm, J., concurring) ("The more cases one reads on constructive possession the deeper is he plunged into a thicket of subjectivity.").

**5.** Equating "armed with" and "actual physical possession" creates some line-drawing problems of its own. A firearm in the pocket of an outer-coat being worn by the offender presumably is in the "actual physical possession," but what if the coat is carried folded over the forearm, or is held in the hand? Is an offender "armed with" a pistol which is located in a paper bag held in the hand? If the answer is yes, then a drug dealer who keeps his pistol and contraband in a paper bag on the ground is not "armed with" the pistol when he reaches into the bag to retrieve the contraband without grasping the pistol, but is "armed with" the pistol when he picks-up the bag. What about a firearm in a gym bag being carried by the offender? Does it matter whether the bag is zipped or unzipped? What about a firearm located in luggage being carried?

gested, and because that definition would include, within the law's coverage, only those offenders who pose the most danger, I would hold that "armed with" means: the weapon is on the person or so close at hand that it would be as instantly available for use as it would have been if it had been on the person, with "on the person" being defined as actual physical possession. Applying that definition to the facts of this case would compel an affirmance on the "while armed" element of the underlying offense.[6] The stash and the loaded pistol were inches apart and a jury could reasonably find that the pistol was instantly available to Johnson for use when he reached into the stash to obtain the contraband. Therefore, at that point it can fairly be said that he was "armed with" the pistol.

---

**6.** The issue of whether Johnson was "armed with" the pistol when he reached for the drugs was *not focused upon in any way by the parties* at trial. No special instruction was requested and the defense did not argue to the jury that Johnson did not fall within the statutory definition. The issue of whether Johnson was "armed with" the firearm was raised for the first time in this appeal.