**Louis BOLANOS and William Guzman, Appellants,**

v.

**UNITED STATES, Appellee.**

·Nos. 94–CF–981, 94–CF–1059.

District of Columbia Court of Appeals.

Argued Oct. 9, 1997.
Decided Sept. 14, 1998.

Kenneth H. Rosenau, appointed by the court, for appellant Louis Bolanos.

Alan L. Balaran, appointed by the court, for appellant William Guzman.

Adam L. Rosman, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney at the time the brief was filed, and John R. Fisher, Elizabeth Trosman, and Patricia Stewart, Assistant United States Attorneys, were on the brief, for appellee.

Before SCHWELB, RUIZ, and REID, Associate Judges.

PER CURIAM:

Following a jury trial, appellants William Guzman and Louis Bolanos were each convicted of two counts of rape while armed in violation of D.C.Code §§ 22–2801, –3202 (1996), and of possession of a firearm during a crime of violence (PFCV), in violation of D.C.Code § 22–3204(b).[1] On appeal, both appellants contend that the trial judge committed reversible error by admitting into evidence, over objection, testimony that appellants assaulted and beat the complaining witness approximately one week before the alleged rapes.

■ This contention is addressed in detail in Judge Reid's lead opinion and in the concurring opinions of Judge Schwelb and Judge Ruiz. A majority of the court believes that the evidence of the beating was relevant to the issue whether the sexual contact between appellants and the complaining witness was consensual, as appellants claimed, or rape, as the prosecutor contended. The court is also of the opinion that, even if the strictures of *Drew v. United States*, 118 U.S.App.D.C. 11, 331 F.2d 85 (1964), and *Roper v. United States*, 564 A.2d 726, 731 (D.C.1989), apply to this case [2], the requirements of these decisions have been satisfied.

The court unanimously holds that, for the reasons stated in the lead opinion by Judge Reid, none of the remaining contentions presented by either appellant warrants reversal

1. Each appellant was sentenced to consecutive terms of fifteen to forty-five years in prison as a principal for the crime of armed rape, and ten to thirty years in prison as an aider and abettor of that offense. Each man was also sentenced to a concurrent sentence of five to fifteen years for PFCV, with a mandatory minimum term of five years.

2. As to the question whether the contested evidence was subject to *Drew* analysis, compare the concurring opinions of Judge Reid, *post* at 534–41, Judge Schwelb, *post* at 541–42, and Judge Ruiz, *post* at 542–47.

of any of the convictions. Accordingly, the judgments appealed from are

*Affirmed.*

REID, Associate Judge, concurring in the judgment:

I join in the judgment of affirmance. After a short factual introduction, in Part I.A. of my concurring opinion, I set forth the factual basis essential to an understanding of the prior beating issue. In Part I.B., I address the precise ruling of the trial court that is before us, that M.A.'s brief reference to the prior beating was admissible to explain why M.A. gave a recanting statement to Guzman's attorney. In Part I.C., I conclude that even assuming the brief reference to the prior beating was subject to *Drew* analysis, the trial court conducted the required *Drew* inquiry. In Part II., I focus on the other issues presented by the case.

### FACTUAL SUMMARY

In December 1993, complaining witness M.A., then seventeen years of age, lived in an apartment located at 1515 Ogden Street, N.W. in the District of Columbia. She resided there with approximately ten other young people, all under the age of seventeen. After school on December 15, 1993, M.A. returned to the apartment; only two of the occupants were present—C.A. and C.H.

Soon Guzman, Bolanos, and another male arrived at the apartment, talking loudly and carrying bottles of beer. They wanted to talk with the young women in private. When M.A. and C.A. refused, Bolanos dragged M.A. into the dressing room or closet and attempted to force her to drink some beer. Guzman joined Bolanos and M.A. in the dressing room, pulled out a bat or stick and laid it on the ironing table. Bolanos pulled out a BB gun and threatened M.A. with it. The third male, J.M., grabbed a stick from under a bed and stood in front of the dressing room door to prevent anyone from entering. C.A. could hear M.A. "screaming and calling for [C.H.]." C.H. tried to get into the dressing room when he heard M.A. yelling, but J.M. threatened to beat him. Eventually, J.M. went into the dressing room holding

the stick, and helped Guzman and Bolanos drag M.A. into the bathroom. He then stood guard outside the bathroom door with the stick.

Bolanos placed the BB gun on top of the toilet tank, removed his pants and underwear, and proceeded to rape M.A. while she cried and banged on the door. He penetrated M.A.'s vaginal wall. Bolanos switched places with Guzman who dropped his pants and underwear, and began to rape M.A. During her trial testimony, M.A. stated that "when [Guzman] was already inside [her]," the police arrived at the apartment, in response to C.A.'s call. They heard cries and screams coming from a back room that was locked. They banged on the bathroom door. As the police entered the bathroom, Guzman told M.A. in Spanish, "say that this had happened before and that [I] was related to one of them and that this was a normal thing that [we] did in this game." When he looked at the scene inside the bathroom, Officer David Gaither saw Guzman and Bolanos "sweating" and "laughing." They did not have on pants. M.A. was "screaming, her face was red, she didn't … have any pants on." A "handgun" was on top of the toilet.

When the officers took M.A. into the kitchen to speak with her, she was afraid and scared to talk until a female officer took over the questioning. Subsequently, she was taken to the hospital for examination. Dr. Timothy McElrath, then an intern at D.C. General Hospital, examined M.A. He saw bruises on parts of her upper torso, but "no signs of trauma" in the pelvic area. He stated that it was "not unusual in a woman who has experienced recent vaginal intercourse, nonconsentually, to have no signs of bleeding, tearing, [or] bruising to the genital area." In addition, he declared that "the lack of trauma doesn't necessarily preclude sexual assault."

### ANALYSIS

#### I.

I turn first to Guzman and Bolanos's contention that the trial court improperly admitted evidence of uncharged misconduct, the beating of M.A. by Guzman and Bolanos that allegedly took place one week before the

armed rape. The government presented two theories concerning the admissibility of this evidence. First, the prior beating could be introduced to show M.A.'s state of mind as to whether she consented to the sexual encounter with Guzman and Bolanos. Second, the prior beating could be used to explain why M.A. had given a recanting statement to Guzman's attorney. The government asserted that the first theory involved *Drew* [1] evidence, but that the second theory did not implicate *Drew.*

### A.

The factual basis for the issue of the prior beating is important to my analysis. During the pretrial hearing on motions, the trial court considered the government's written notice of intent to introduce other crimes evidence. Government counsel informed the trial court that:

> The evidence we would seek to introduce is specifically that one week, perhaps eight days before the rape, the complainant inside the same apartment as the rape took place was confronted by the two defendants. . . .
>
> She was seated on a couch. . . . Our evidence would be that Mr. Bolanos took the large, light-colored stick . . . from Mr. Guzman's hand and . . . struck [M.A.]. . . .
>
> [M.A.] will not be able to say with certainty how many times Mr. Bolanos struck her but she estimates two. . . .
>
> This was done in the presence of Mr. Guzman. An eyewitness will testify that Mr. Guzman also struck [M.A.] perhaps once or twice . . . [w]ith a stick. However, the complainant is uncertain as to that. By that time she had already been struck several times.

The prior beating would be used to show M.A.'s state of mind, said government counsel. As the government stated:

> [W]hen the defense does something in the trial to make the lack of consent or consent a genuine contested issue, at that point the government should have leave to introduce this evidence on the question of consent.

That could take place in opening statement or in cross-examination.

When the trial judge asked "if [the defense] sought to impeach [M.A.] with her . . . recanting of her claim that it was rape, . . . would [the government] use it at that point to explain her fear[,]" government counsel indicated that the prior beating would not be used to show the defendants' intent.

The trial court summarized its understanding of the government's position:

> I just want to make sure—you said three grounds. . . . You've withdrawn the one about the defendant[s]' intent. So we're left with [M.A.'s] state of mind regarding if the issue of consent becomes a contested issue and if she's impeached in terms of an explanation of her . . . alleged fear.

The government added its view that "a mini trial in advance to determine the strength of the *Drew* evidence" would not be necessary because "it [would] come in at least through [M.A.] and one eyewitness and possibly two eyewitnesses."

Counsel for Mr. Guzman took the position that the prior beating "doesn't fit under any of the [*Drew*] exceptions because those exceptions are limited to evidence that's relevant to the defendant's state of mind at the time of the offense." He maintained that the evidence of the prior beating would be used improperly to show propensity to commit the crime of armed rape. The government denied that the evidence would be used to show propensity, but agreed that the prior beating did not "fit in with a traditional *Drew* exception." Nonetheless, the government contended, "*Drew* itself says that the list [of exceptions] is not exclusive, any legitimate evidentiary purpose [is acceptable]." The government acknowledged that no *Drew* exception had been carved out to show the complainant's state of mind based upon a defendant's prior criminal conduct.

Counsel for Bolanos contended that consent to the rape was not an issue, and thus, the government should not be allowed to introduce the prior beating as evidence. When the trial judge pressed him as to his views on the government's second theory,

---

1. *Drew v. United States,* 118 U.S.App.D.C. 11,     331 F.2d 85 (1964).

that the prior beating could be used to explain M.A.'s recanting statement to Guzman's counsel, Bolanos's counsel said the prior beating should not be admitted for that purpose because of its prejudicial nature.

Government counsel then made it clear that the prior beating would be used "to try to take the sting out [of the recanting statement] in [the] direct [testimony of M.A.]." Counsel for Guzman responded, "Your Honor, I have no objection to [the government's] request," whereas counsel for Bolanos expressed an unreadiness to state a position until he had an opportunity to read applicable case law.

While the trial court reserved its final decision on the consent issue until trial, it indicated that testimony regarding the prior assault would be allowed to explain the reason for the recanting statement:

[T]he impeachment and explanation ... I would not preclude.... I think that that's allowed and would be—could be a perfectly good explanation for it. And I think generally you—you do an analysis of probative versus prejudicial.... I don't think you have to do a Drew analysis for an explanation. As long as you're not going [to allow] any independent evidence coming in, which I wouldn't do.

So, in other words, eyewitnesses don't come in and testify about it.... [I]f she chooses to do so, to give this explanation of why she recanted, [that will be permitted], not other eyewitnesses explaining or testifying independently to what they observed as this alleged assault.

. . . .

So the only thing that would come out in the case in chief would be, as I said, ... her explanation for recanting her testimony.

Prior to the commencement of the trial, the trial judge revisited the issue of the prior beating and the government's theories of admissibility: (1) to explain why M.A. gave a recanting statement to Guzman's attorney and (2) to show M.A.'s state of mind with respect to the issue of consent. With regard to the first theory, the trial judge again recognized that the government might attempt to take the sting out of the recanting statement by way of explanation during M.A.'s direct testimony. The court permitted this approach but cautioned the government: "[O]n the issue of recantation, I think you could do it over the objection of the defendants ... [but] just be mindful that it be clear that there is some criminal conduct on [the defendants'] part." As to the second government theory concerning consent and M.A.'s state of mind, the trial court again reserved a final ruling until the record at trial established that consent would be an issue.

In his opening statement, counsel for Guzman began with the theme that M.A. consented to having sex with Guzman: "On December 15, 1993, [M.A.] agreed to have sex with William Guzman. And that day, Mr. Guzman did not force, threaten or coerce her to have sex with him." Bolanos's counsel made no remarks in his opening statement concerning the issue of consent.

M.A. was called as the government's first witness. Near the end of her testimony, the government asked questions relating to her recanting statement to Guzman's counsel. M.A. admitted telling defense counsel that "everything that had happened was a lie," that what she "had told [the assistant U.S. attorney] was a lie and that what [she] was telling him [Guzman's counsel] was the truth. But, really, what [she] was telling him was not the truth." The following exchange then took place:

[Government Counsel]: Then why did you say it?

[M.A.]: Because I was scared.

[Government Counsel]: What were you scared of?

[M.A.]: That probably the same thing that when—like, a week before I was raped, I was beaten up by the same guys with bats—

Counsel for Bolanos objected, and counsel for both Guzman and Bolanos asked to approach the bench. The trial court refused their request, saying, "[W]e have discussed this numerous times. You can do follow-up questions."

The government posed no additional questions pertaining to the prior beating, but focused on the reason for M.A.'s meeting with Guzman's counsel. In response to questioning by government counsel, M.A. explained that Guzman's brother came to the area of her school, started crying and asked her "to reject the case" against his brother. Thereafter, he came to her school "every other day" to make the same request. Guzman's brother went to the school on February 3, 1994, with Bolanos's father and asked M.A. to accompany them to Guzman's lawyer's office. M.A. stated: "I was so scared, I knew not what to do, I went on with them [to Mr. Puig–Lugo's office]."

At the end of M.A.'s direct testimony, government counsel posed a question to determine whether M.A. willingly had sex with Guzman and Bolanos on the day of the alleged rape. She responded in the negative. At the conclusion of this testimony, counsel for Bolanos requested a bench conference and said to the trial judge:

I need some help. There is something I missed in understanding whether the Court has reached a ruling or something, where I missed it. I must have been asleep at the helm. I thought you had not ruled on that evidence as to whether the prior matter came in.

The trial court responded:

[I]t could come in on the issue of ... why she was afraid and why she recanted her explanations, period.

Without a lot of detail ... [w]hich is exactly the way it's come in. What I reserved was ruling on the issue of consent, in terms of it coming in ... on whether she would have acquiesced or not....

Counsel for Bolanos said: "That's what I needed to hear." Counsel for Guzman wanted to be certain that M.A. was testifying as to only one prior beating. After counsel for the government confirmed that there was only one prior beating of which the government was aware, the trial court told defense counsel:

I think ... you can decide whether you want to follow up with that.... You decide how much you want to open up the

door in terms of [government counsel] putting on independent evidence going into a lot more detail. I reserved that on the issue of consent.

After a brief recess, the trial court added:

I thought I had indicated ... in the context of the way it was coming in because we were not getting any independent evidence, that—that it was more probative than prejudicial. And then I thought where you've got such a key document as this recantation ... that it seemed to me, in that context, it was important to come out.

The trial court then made it clear that no definitive ruling had been made on the issue of consent, but that it remained to be determined how to handle the matter if it came out on redirect testimony, rather than in rebuttal.

On cross-examination, Guzman's counsel questioned M.A. extensively regarding her visitation to his office, her recanting statement, and the alleged inconsistencies between her prior statements and her trial testimony regarding the alleged rape and events leading up to the rape. He queried her as to whether her bruises actually resulted from a fight with girls at a party, rather than from any prior beating by Guzman or Bolanos.

On the following day of the trial, before government counsel conducted redirect examination of M.A., the trial judge again addressed the issue of the prior beating, and spent substantial time discussing with counsel whether the prior beating could be presented as evidence showing M.A. was coerced into having sex with Guzman and Bolanos. The trial judge made a preliminary determination that evidence of the prior beating could come in on the issue of consent only if the defense made consent a contested issue during the presentation of its evidence. When it became clear that neither defendant would testify and the defense would present no substantive evidence on the question of consent, government counsel said she "would ... not be asking to present evidence of the prior beating because of the court's ruling." Accordingly, the government never present-

ed independent evidence of the prior beating; nor did it seek to develop M.A.'s brief reference to the prior beating. Nonetheless, Guzman and Bolanos insist that M.A.'s brief reference to the prior beating constituted *Drew* evidence designed to show propensity to commit the crime of armed rape.

### B.

On the record before us, I cannot say that the trial judge abused her discretion in allowing M.A.'s limited testimony on direct examination of the prior beating to explain why she gave a recanting statement to Guzman's attorney.

The trial court allowed M.A. to refer to the prior beating in a limited fashion during her direct testimony, not as substantive evidence, but to explain why she recanted her account of the rape.[2] The brief reference to the prior beating was not substantive evidence, but was designed to take the sting out of the recantation with which the defense planned to impeach her. This situation is analogous to our approach in *Reed v. United States,* 452 A.2d 1173 (D.C.1982), *cert. denied,* 464 U.S. 839, 104 S.Ct. 132, 78 L.Ed.2d 127 (1983) where we said that: "[A]ny party is entitled 'to bring out on direct examination damaging information about ... his witness, ...'" 452 A.2d at 1179 (citation omitted). We further stated: "The government's ... purpose in eliciting on direct examination of its witnesses that they had made statements inconsistent with their trial testimony was to 'take the sting out' of anticipated impeachment of the witnesses by the defense." *Id.*

Before allowing the brief reference to the prior beating as an explanation of M.A.'s recantation, the trial judge made a determination that the probative value of the explanation was not "substantially outweighed by the danger of unfair prejudice." *Johnson v. United States,* 683 A.2d 1087, 1090 (D.C. 1996) (en banc). Moreover, appellants had an adequate opportunity to question M.A. about her recantation. During cross-examination of M.A., Guzman's counsel posed extensive questions about M.A.'s recanting statement, pointing out the inconsistencies

between her trial testimony and her recanting statement.

In summary, my review of the record before us shows that the reference to the prior beating did not come in as substantive evidence; its probative value was not substantially outweighed by any danger of unfair prejudice; and appellants had an adequate opportunity to question M.A. about her recanting statement. Thus, I cannot say that the trial court abused its discretion in allowing limited testimony of the prior beating to explain M.A.'s recanting statement.

In her concurring opinion, Judge Ruiz fails to focus on the precise rulings made by the trial judge with respect to the prior beating. The trial judge assumed that M.A. would be impeached with her recantation, and thus, first ruled that so long as M.A.'s reference to the prior beating was more probative than prejudicial, evidence of the prior beating could come in as an explanation of M.A.'s recantation. Second, the judge ruled that, if independent evidence of the prior beating was introduced in the government's case in chief, or if the defendants testified or the defense presented evidence regarding consent, the court would rule that the evidence of the prior beating would come in with respect to the issue of consent. The trial court never formally made the second ruling because no independent or substantive evidence concerning the prior beating was introduced either by the government or the defense.

I believe that Judge Ruiz rejects the trial court's approach without a complete understanding of the first ruling formally made in this case with respect to the prior beating. Moreover, she appears to assume that any prior bad act must necessarily be regarded, in the first instance, as *Drew* "other crimes" evidence, regardless of the way in which it is used or introduced at trial. This viewpoint runs counter to our case law. "*Drew* 'restricts the introduction ... of an accused's prior crimes or bad acts' '*as substantive evidence* ....'" *Samuels v. United States, supra* note 2, 605 A.2d at 597 (quoting *Sherer v. United States,* 470 A.2d 732, 738 n. 5 (D.C. 1983) (emphasis in original)). The prior

---

**2.** *See Samuels v. United States,* 605 A.2d 596, 597 (D.C.1992).

beating was not introduced as substantive evidence. Rather, what the trial judge recognized was that M.A.'s recantation could be used to impeach her, and thus, the government could "take the sting" out of the recantation by having her explain the recantation through a brief reference to the prior beating. In short, the prior beating was not used to impeach, but to fend off or explain what undoubtedly would have been a defense effort to impeach M.A. with her recantation. I am aware of nothing in *Drew* or our subsequent cases which would preclude the precise use of the prior beating allowed in this case.

### C.

Even assuming that the brief reference to the prior beating was subject to *Drew* analysis, I am satisfied that the trial court conducted the required pretrial *Drew* inquiry before finally excluding the use of the prior beating as substantive evidence. In *Daniels v. United States*, 613 A.2d 342 (D.C.1992), we said:

> The trial court may act within its discretion to conduct its pretrial inquiry on the admissibility of the other crimes evidence by means of a "detailed proffer from the government" instead of holding, in effect, a bench trial of the other crime, which presumably will be fully replicated before the jury if admitted.

*Id.* at 347 (citation omitted). Here, the government made a detailed proffer of M.A.'s testimony concerning the prior beating and indicated that it would also present one or two independent witnesses to the incident.

In *Roper v. United States*, 564 A.2d 726 (D.C.1989), we recognized "four specific requirements for the admission of other crimes evidence":

> (1) there must be clear and convincing evidence that the defendant committed the other offense; (2) the other crimes evidence must be directed to a genuine, mate-

rial and contested issue in the case; (3) the evidence must be logically relevant to prove this issue for a reason other than its power to demonstrate criminal propensity; and (4) the evidence must be more probative than prejudicial.

*Id.* at 731 (citations omitted). The trial court addressed each of these requirements. First, the trial court determined that it "would be inclined to find there's clear and convincing evidence" of the prior beating based on the testimony of M.A. and based on the government's proffer that independent witnesses would testify about the prior beating. This determination was made only after the trial court listened to M.A.'s testimony both on direct examination and cross-examination, and found her testimony credible. Second, the court determined that if the defense made consent a contested issue, the prior beating would be relevant to M.A.'s state of mind regarding the issue of consent.[3] Third, the court concluded that the prior beating would not be used to show criminal propensity of the defendants, but would be introduced to show the state of mind of the complainant on the issue of consent. Fourth, the court determined that while the evidence of the prior beating was prejudicial, its probative value was not substantially outweighed by any danger of unfair prejudice. The judge indicated that she would attempt to limit the prejudice and was open to suggestions by counsel as to how to accomplish the limitation. Ultimately, of course, the defense decided not to make consent a contested issue, and substantive evidence of the beating did not come in. Furthermore, even assuming that M.A.'s limited testimony of the prior beating constituted other crimes evidence, neither Bolanos nor Guzman requested a limiting or a curative instruction. Based on the record before us, I conclude that the trial court did not abuse its discretion in reaching a preliminary decision—after applying the pretrial inquiry factors set forth in *Roper*—that substantive evidence of the

---

3. The trial court recognized that the use of the prior beating to show M.A.'s state of mind would not qualify under any traditional exception to *Drew* and would present a case of first impression in this jurisdiction. The court shared with counsel her research into the issue showing that other jurisdictions, including the state of Mary-

land, *see Stevenson v. State*, 94 Md.App. 715, 619 A.2d 155, 160–61 (1993), allowed other crimes evidence to counter a consent defense. Since the prior beating was excluded as substantive evidence because consent was not a contested issue, we need not address the *Drew* issue.

prior beating could be admitted if independent evidence of the prior beating was introduced in the government's case in chief, or if the defendants testified or presented evidence regarding consent.

## II.

■ Appellants' other arguments are discussed briefly. Guzman contends that the trial court's jury instruction constructively amended the indictment with respect to the armed rape charge, because the indictment charged rape "while armed with a stick and a firearm" and the judge instructed the jury that appellants could be "armed with" the weapons or have had them "readily available." Further, he argues, the trial court erred in imposing a mandatory minimum sentence for armed rape.

Guzman maintains that our decision in *(Phillip) Johnson v. United States,* 686 A.2d 200 (D.C.1996), compels the conclusion that the jury instruction constructively amended the indictment. We disagree. *(Phillip) Johnson* dealt only with the issue of mandatory minimum sentence for persons committing certain crimes while armed. There we said that "[t]o receive a mandatory minimum sentence, a single perpetrator must actually have been 'armed'; it is not enough for this purpose that the defendant had a gun 'readily available.'" *Id.* at 204 (citation and internal quotation omitted). Contrary to Guzman's position, *(Philip) Johnson* does not apply to situations other than mandatory minimum sentencing. Moreover, the mandatory minimum term was imposed only with respect to the possession charge, not the armed robbery charge. The trial court distinguished between "while armed" and "readily available" only in the context of instructing the jury as to the elements of the old armed rape law. The court properly instructed the jury that they need not find appellants were actually armed with the stick or firearm while the rape was in progress, but that it would be sufficient if they found the stick or firearm readily available to appellants at the time of the rape. This instruction was consistent with our decision in *(Alfred) Johnson v. United States,* 613 A.2d 888, 897 (D.C.1992). We see no error.

■ Guzman's argument that the government failed to prove sexual penetration, a required element of rape, is without merit. M.A. testified that after Bolanos had finished raping her, Guzman "pulled down his clothes, too—his pants and underwear completely. And he started to rape me. And when he was already inside of me, the cops arrived." Viewing the evidence in the light most favorable to the government, *see Patterson v. United States,* 479 A.2d 335, 337–38 (D.C. 1984), reasonable jurors could find that the reference to "when he was already inside of me" was sufficient to satisfy the element of sexual penetration. *See Williams v. United States,* 357 A.2d 865, 866 (D.C.1976); *Holmes v. United States,* 84 U.S.App.D.C. 168, 169, 171 F.2d 1022, 1023 (1948).

■ Both Guzman and Bolanos challenge their convictions on the ground that the trial court abused its discretion when it failed to allow full exploration of M.A.'s status as a person in need of supervision (PINS). The trial court reviewed M.A.'s PINS jacket *in camera* and concluded that it dealt primarily with family neglect of M.A. and her "community placement" rather than with her moral turpitude or dishonesty. Nonetheless, the trial court permitted defense counsel to cross-examine M.A. regarding her bias, credibility, and lifestyle. Based on the record before us, we see no abuse of discretion. *See Stack v. United States,* 519 A.2d 147, 151 (D.C.1986); *Springer v. United States,* 388 A.2d 846, 854 (D.C.1978).

Finally, Bolanos contends that the trial court erred in precluding his questions regarding the use of cocaine by M.A. His defense counsel raised the issue as follows:

It is my understanding that [M.A.] participated in the use of cocaine in this apartment on frequent occasions. This is relevant to her ability to observe and recollect with accuracy. It's relevant to her state of mind and her psyche. I make this statement on information and belief. I do not have a witness who can appear and say, I saw her use. On that basis, what is the Court's ruling?

The trial judge asked what evidence counsel planned to present, and further inquired:

"You have no one who is going to indicate that she would have used it during the period of time in question or shortly beforehand?" Defense counsel responded: "That's right." The judge indicated she would disallow questions about cocaine use unless they related to a period shortly before the crimes charged. Defense counsel "proffer[ed] that [M.A.'s cocaine use] would [have] be[en] within the week of the 8th to the 15th of December." The trial court viewed the time frame as "too distant" and did not allow the questions. Defense counsel raised no objection to the court's final ruling.

In *Rogers v. United States*, 419 A.2d 977 (D.C.1980), we said: "The opportunity to cross-examine witnesses is a fundamental right in our system of justice.... Nevertheless, regulation of the extent and scope of cross-examination lies with the discretion of a trial judge." *Id.* at 981 (citations omitted). We also declared that:

> Given the highly inflammatory nature of an allegation that a witness is a drug user, a trial court must exercise discretion concerning the proper scope of examination. Drug habits are generally a collateral issue unless an evidentiary foundation can be established that the witness was using drugs at the time of the incident.

*Id.* (citations omitted).

■ In this case, defense counsel stated he would present no witness who could say he or she saw M.A. using drugs. Even with the proffer that the use "would [have] be[en]" within the week of the 8th to the 15th of December," counsel had no witness who could establish that M.A. "was using drugs at the time of the incident." On appeal he states, without foundation in the record, "that the defense was not allowed to ask about [M.A.'s] drug usage for the period of time involving the incident itself." Without a proper evidentiary foundation for questions about M.A.'s drug use at the time of the incident, the trial judge did not abuse her discretion in concluding that such questions would be more prejudicial than probative. *Id.*

For the foregoing reasons, I agree that the judgments of the trial court should be affirmed.

SCHWELB, Associate Judge, concurring in the judgment:

I join in the judgment of affirmance. I write separately, however, to explain my view that the evidence of the beating was admissible to show that M.A. did not consent to sexual relations with the defendants and that the conduct in question was not voluntary intercourse but rape.

In this case, as in *Bailey v. United States*, 699 A.2d 392, 398 (D.C.1997), nobody suggested that there was no sexual intercourse between the defendants and the complainant, and "the sole contested issue was whether [Guzman and Bolanos] forced [M.A.] to have sex with [them] against her will.[1] For all practical purposes, the question for the jury was whether [M.A.] consented." "[F]orce and consent [are] flip sides of the same coin...." *Hicks v. United States*, 707 A.2d 1301, 1305 (D.C.1998) (paraphrasing counsel).

Guzman's attorney first alluded to the "consent" defense in his opening statement. Guzman also introduced into evidence M.A.'s "recantation," in which she told Guzman's counsel that she had sex with the two men willingly and that Bolanos was her boyfriend at the time. Both defense attorneys attempted to persuade the jury in closing argument, largely on the basis of the recantation, that M.A.'s trial testimony was false, that the young people were really "partying," that the sexual activity was consensual, and that there was therefore no rape.[2]

In such a context, the relevance of evidence that the defendants beat M.A. with a stick only a week or so before the alleged

---

1. The rape of which the defendants were convicted occurred in December 1993 prior to the adoption of the Anti–Sexual Abuse Act of 1995. *See* D.C.Code § 22–4101 *et seq.* (1996). Under the law applicable to the defendants, *see* D.C.Code § 22–2801 (1981), the prosecution was required to prove that the accused "ha[d] carnal knowledge of a female forcibly and against her will."

*See Russell v. United States*, 698 A.2d 1007, 1009 n. 4 (D.C.1997) (discussing 1995 amendment).

2. Although Bolanos' counsel made this argument somewhat obliquely, there can be no doubt that this was his basic point.

rape appears to me to be quite obvious. "Consent" is meaningless when it is given under duress. A young woman obviously feels a great deal less free to withhold sexual favors if she can expect severe physical retribution if she declines to go along. Proof of such a beating thus illuminates the question whether any purported consent was voluntary or coerced.

Moreover, M.A.'s testimony that the defendants beat her was not "other crimes" evidence of the kind that is subject to the strictures of *Drew v. United States,* 118 U.S.App. D.C. 11, 331 F.2d 85 (1964). In *Drew,* the evidence of an uncharged attempted robbery was unrelated to the robbery for which the defendant was being tried, and it shed light primarily, if not exclusively, on the defendant's criminal predisposition. Here, the beating, if it occurred, involved the same *dramatis personae* as the alleged rape, and bore directly on the question whether there was a rape.

This court, sitting en banc, has explained that

> *Drew* does not apply where ... evidence [of another crime] (1) is direct and substantial proof of the charged crime, (2) is closely intertwined with the evidence of the charged crime, or (3) is necessary to place the charged crime in an understandable context.

*(William) Johnson v. United States,* 683 A.2d 1087, 1098 (D.C.1996) (en banc). The present case falls squarely within the third of these categories, almost certainly within the first,[3] and at least arguably within the second category as well.

In my opinion, the exclusion of evidence of the beating would have extracted from its context, and placed in an incomplete and inaccurate light, the dispositive question whether the sexual activity which precipitated these prosecutions was forced upon M.A.

---

3. One might quibble whether the alleged beating was "direct" evidence of lack of consent, but the relevance and potential persuasiveness of proof of the uncharged conduct seems to me to be readily apparent.

4. We have held that where uncharged criminal conduct is "inextricably intertwined with evidence of the charged offense," evidence of the

against her will. "Events obscure, ambiguous, or even meaningless when viewed in isolation may, like the component parts of an equation, become clear, definitive, and informative when considered in relation to other action." *Local Lodge No. 1424 v. NLRB,* 362 U.S. 411, 416 n. 6, 80 S.Ct. 822, 4 L.Ed.2d 832 (1960) (citation omitted). This is particularly true where, as in this case, the principals knew each other, and where their relationship had a history. "An attempt to restrict the evidence in a case of this kind to the events of the [day of the crime] would unreasonably cramp the inquiry, to the detriment of the search for truth." *Clark v. United States,* 593 A.2d 186, 195 (D.C.1991).[4]

Many courts throughout the country have held that evidence of the kind here at issue is admissible on the question of consent. *See Stevenson v. State,* 94 Md.App. 715, 619 A.2d 155, 160–62 (1993) (collecting authorities). I agree with those decisions, and I conclude that the convictions must be affirmed.

RUIZ, Associate Judge, concurring:

I disagree with both of my colleagues on the novel issue presented by this case: whether, without applying *Drew* analysis, evidence of other crimes of the defendant is admissible to rehabilitate a complaining witness who has recanted her story. However, because the contested evidence in this case is, I believe, admissible under our usual analysis of other crimes evidence, I concur in affirming the judgment.[1]

It is established that before evidence of other crimes of the defendant can be admitted, it must first hurdle the prohibition in *Drew v. United States,* 118 U.S.App.D.C. 11, 331 F.2d 85 (1964), that the evidence not be admitted for the purpose of showing disposition to commit crime. *See id.* at 15; *Samuels v. United States,* 605 A.2d 596, 597 (D.C. 1992). Evidence of other crimes may be

---

contemporaneous conduct is directly admissible without the necessity for a cautionary *Drew* instruction. *Toliver v. United States,* 468 A.2d 958, 961 (D.C.1983). The basis for the admission of the evidence of the beating in this case could be described as a sort of "vertical *Toliver*" doctrine.

1. See note 8 *infra.*

admitted for other, limited purposes, such as to prove motive, intent, absence of mistake or accident, a common scheme or plan, or the identity of the person charged with the crime, if the other crimes evidence is "relevant and important to any one of these five issues." *Drew, supra,* 118 U.S.App.D.C. at 16, 331 F.2d at 90. Because of its presumed prejudicial effect, however, the admission of other crimes evidence for even one of these limited purposes is subject to the safeguards set out in *Roper v. United States,* 564 A.2d 726, 731 (D.C.1989).[2] *See (William) Johnson v. United States,* 683 A.2d 1087, 1092–93 (D.C.1996) (en banc).

It is essential to understand that even when admissible under *Drew,* evidence of other crimes may never be admitted solely for the purpose of proving that the defendant committed the other crime because that fact is *irrelevant as a matter of law* to the offense of which the defendant is charged. *See Drew, supra,* 118 U.S.App.D.C. at 15 & n. 7, 331 F.2d at 89 & n. 7; *see also Campbell v. United States,* 450 A.2d 428, 429 (D.C.1982) ("It is fundamental to a system of criminal justice based on the presumption of innocence, that the process of adjudication be insulated from evidence of past criminal or wrongful conduct of an accused other than the charged offense."). That is exactly, however, the purpose for which M.A.'s testimony that she "was beaten up by the same guys with bats" was admitted in this case: to prove that Bolanos and Guzman had beaten M.A. about a week before she claimed they raped her, thereby engendering such fear in her that they would do violence to her again, that she subsequently recanted her complaint of rape to the police.

Judge Reid's analysis is based on the incorrect assumption that because the use of the other crimes evidence against Bolanos and Guzman was not substantive, but merely an explanation of the complaining witness' recantation, it is unnecessary to test the evidence against *Drew* strictures. The underlying assumption is wrong, however, because M.A.'s testimony that Bolanos and Guzman had beaten her was introduced for the truth of its content. In order to effectively rehabilitate M.A. by explaining that she recanted out of fear of being beaten again, the government had to persuade the jury that Bolanos and Guzman had *in fact* beaten her at an earlier time. Otherwise, M.A.'s fear would not have been credible. Therefore, even though the other crimes evidence was used in the context of rehabilitating the witness in anticipation of her being impeached by the defense with her recantation, the evidence was undisputedly used for substantive purposes. The flaw in Judge Reid's analysis lies in equating the nonsubstantive use for impeachment purposes of the complaining witness' recantation (a prior inconsistent statement) with the substantive use of the other crimes evidence to rehabilitate the witness.[3]

Reliance on *Reed v. United States,* 452 A.2d 1173 (D.C.1982), *cert. denied,* 464 U.S. 839, 104 S.Ct. 132, 78 L.Ed.2d 127 (1983), is for naught on the issue before us. All *Reed* permits is the government's *anticipatory rehabilitation* of its own witness by bringing out that witness' prior inconsistent statements as a matter of strategy, in order to "take the sting out" before the defense does so on cross-examination. *See id.* at 1179; *Kitt v. United States,* 379 A.2d 973, 975 n. 2 (D.C.1977) (noting that eliciting a witness' prior convictions on direct examination is not

2. The four safeguards are that: 1) there must be clear and convincing evidence that the defendant committed the other crime, 2) the other crimes evidence must be directed to a genuine, material and contested issue in the case, 3) the evidence must be logically relevant to prove a material and contested issue for a reason other than its power to demonstrate propensity, and 4) the evidence's probative value must not be substantially outweighed by the danger of unfair prejudice, *see (William) Johnson, supra,* 683 A.2d at 1092–93. Two prophylactic measures are employed to further safeguard against undue preju-

dice: the jury is to be given a cautionary instruction on the permissible and impermissible uses of the other crimes evidence, *see id.* at 1097 n. 10, and the trial court is to defer ruling on the admissibility of other crimes evidence until it is clear that the evidence is necessary to the case, *see Wilson v. United States,* 690 A.2d 468, 472 (D.C.1997) (Ruiz, J., concurring) (citing cases).

3. Judge Reid inconsistently states that evidence of the prior beating "was not introduced as substantive evidence" yet "was not used to impeach." *Ante* at 538–39.

impeachment, but rather is an effort to enhance the witness' credibility). *Reed* emphasized that although the government's attempt to take the sting out is not impermissible impeachment of one's own witness, but rather an effort to "enhance" the witness' credibility, the government may not cross the line and try to "bolster" an unimpeached witness with prior consistent statements. *See Reed, supra,* 452 A.2d at 1179 (citing *Johnson v. United States,* 434 A.2d 415, 420 (D.C.1981)).[4] Judge Reid would allow the government not only to "take the sting out" by anticipating the impeachment material, which is what *Reed* permitted, but to apply the salve of an explanation, which is what *Reed* expressly disallowed. *Reed,* moreover, says nothing about whether other crimes evidence of the accused can be used for the purpose of either impeaching or rehabilitating another witness.

Judge Reid improperly relies on an impeachment line of cases which do not support carving out yet another exception to *Drew* analysis for the distinct purpose of rehabilitation presented here. *See Sherer v. United States,* 470 A.2d 732, 738 n. 5 (D.C.1983) ("These impeachment rules [permitting impeachment of witnesses with specific instanc-

es of the witnesses' 'bad conduct'] should not be confused with the analytically distinct doctrine that restricts the introduction, as substantive evidence, of an accused's prior crimes or bad acts.") Our law recognizes a narrow exception, where other crimes evidence may be admissible without implicating *Drew* concerns, where such evidence is used "strictly for impeachment purposes." *See Samuels, supra,* 605 A.2d at 597 (stating that *Drew* " 'restricts the introduction . . . of an accused's prior crimes or bad acts' " as substantive evidence and that *Drew* analysis is inapplicable to evidence admitted "strictly for impeachment purposes") (quoting *Sherer, supra,* 470 A.2d at 738 n. 5). That exception, however, is limited to the use of prior bad acts of the witness,[5] and then only for non-substantive impeachment purposes.[6]

The significant issue in this case, therefore, is not whether the government could "take the sting out" of the complaining witness' recantation by bringing it out on direct examination, but whether the government could bolster its witness by anticipatorily *rehabilitating her,* not with her prior consistent statements—which *Reed* found to be impermissible with respect to both its timing and

---

**4.** *Reed* expressly disallowed the use of prior consistent statements to rehabilitate a witness on either the government's direct examination or even on redirect, after the witness had been impeached, because those statements did not come under the two "exceptional situations" where prior consistent statements are permissible, "1) where the witness has been impeached with a portion of a statement and the rest of the statement contains relevant information that could be used to meet the force of the impeachment, and 2) where there is a charge of recent fabrication." *Reed, supra,* 452 A.2d at 1180.

**5.** "The first, and probably the most effective and most frequently employed . . . [mode of attack upon the credibility of a witness] is an attack by proof that *the witness* on a previous occasion has made statements inconsistent with his present testimony." 1 McCormick on Evidence § 33, at 111–12 (John William Strong, ed., 4th ed. 1992) (emphasis added). With respect to impeachment with other crimes, *Sherer,* in setting out the applicable rules, similarly makes clear that it is limited to the other crimes of the witness:

The general credibility of a witness can be impeached by evidence that the witness has been convicted of a crime punishable by death or an imprisonment in excess of a year, or of a crime involving dishonesty or false statement

regardless of the punishment . . . a witness may be cross-examined on a prior bad act that has not resulted in a criminal conviction only where: (1) the examiner has a factual predicate for such question, and (2) the bad act bears directly upon the veracity of the witness in respect to the issues involved in the trial. . . . Moreover, where such impeachment is permitted, evidence of the prior misconduct may be elicited only by cross-examination of the witness; it may not be proved by extrinsic evidence.

470 A.2d at 738 (citations and internal quotations omitted).

**6.** As McCormick states:

The theory of attack by prior inconsistent statements is not based on the assumption that the present testimony is false and the former statement true but rather upon the notion that talking one way on the stand and another way previously is blowing hot and cold, and raises a doubt as to the truthfulness of both statements. More particularly, the prior statement, assuming it is inadmissible as substantive evidence under the hearsay rule, may be used in this context only as an aid in judging the credibility of the testimony with which the previous statement is inconsistent.

McCormick, *supra* note 5, § 34, at 114.

content—but *with the presumptively prejudicial evidence of the accused's other crimes.* Whether the government can do so bypassing *Drew* analysis altogether, as Judge Reid decides, is an issue we have never before addressed. To the extent we have considered a somewhat similar situation, we have applied *Drew* analysis and decided that the evidence was inadmissible. *See Campbell v. United States,* 450 A.2d 428, 431–32 (D.C. 1982) (evidence of defendant's past wrongful conduct toward complaining witness was inadmissible under *Drew* to explain her fear of him because prejudice outweighed probative value).[7]

Judge Schwelb would conclude that the evidence is admissible because consent is always an issue in a rape case, and evidence that Guzman and Bolanos had earlier beaten M.A. was probative of M.A.'s lack of consent to the sexual activities in the bathroom or, put another way, of the defendants' intent to use force in their sexual encounter with her.[8] See *ante* at 541–42. The government argued that the prior beating was admissible, under *Drew,* to the issue of lack of consent. Judge Schwelb nonetheless concludes, citing *(William) Johnson, supra,* 683 A.2d at 1098, that evidence of the prior beating to show the accused's intent is not subject to *Drew* strictures, because it is "necessary to place the charged crime in an understandable context."[9] Judge Schwelb describes this theory "as a sort of 'vertical *Toliver*' doctrine,"[10] referring to *Toliver v. United States,* 468 A.2d 958, 961 (D.C.1983), which held that

---

7. Even if *Drew* were deemed to include the use of the accused's other crimes to rehabilitate another witness, I would have to conclude that the other crimes evidence presented in this case failed the fourth *Roper* prong, the probative/prejudicial balancing test, even as modified in *(William) Johnson, supra,* 683 A.2d at 1092–93, to require that the evidence's probative value be substantially outweighed by the danger of unfair prejudice. The chronology of events here is that M.A. was beaten by Bolanos and Guzman; that about a week later she was raped by them, at which time she complained to police; and that some time after receiving entreaties and, perhaps, threats, from the family and friends of the accused, she recanted her claim of rape in a sworn statement to defense counsel. In light of this chronology, it is difficult to see how a beating more than a week before the alleged rape would better explain M.A.'s fear of the accused after the rape than the rape itself. Moreover, evidence that M.A. was approached by several members of the family and friends of the accused after the rape to persuade her to "reject the rape" complaint and even accompanied her to defense counsel's office, was more recent in time and directly explained why she gave a sworn recantation. Thus, as in *Campbell, supra,* 450 A.2d at 431, "other means of proof, especially the fact that the reasonableness of [M.A.'s] fear is better explained by ... [other facts], limits the probative value of ... [the other crimes evidence] for this purpose." For this reason, even if *Drew* analysis were not employed, the trial court would have been well advised not to admit evidence of the prior beating, because " 'whenever'—and *not simply in the Drew context*—'relevant evidence poses a danger of unfair prejudice,' the trial court 'must weigh the apparent probative value of the evidence against the unfairly prejudicial effect that it is likely to have.' " See *Wilson, supra,* 690 A.2d at 470 (quoting *(William) Johnson, supra,* 683 A.2d at 1098).

8. I agree with Judge Schwelb that consent, or the use of force, is always an issue in a rape case such as this where both the fact of the sexual activity and the identity of the participants is not in dispute. In this regard, evidence of the prior beating, which M.A. testified had been with "bats" or a "stick", was probative in light of evidence that M.A. had been threatened with a stick, as well as with a gun, at the time of the rape. As Judge Reid points out, the trial court ruled that if consent were an issue in the case (which, of course, it was), the prior beating would be relevant to the complaining witness' lack of consent. As Judge Schwelb explains, the evidence is also probative of the other side of the same coin, the accused's intent to use force, thereby skirting the unresolved issue noted in Judge Reid's footnote 4. The trial court made a preliminary ruling, applying the *Roper* safeguards, that if consent became an issue, evidence of the prior beating would be admissible. As I believe that the trial court did not abuse its discretion in coming to this conclusion, I would affirm the conviction on this alternative ground. Although the trial court did not give a cautionary instruction, as we have required, we review its failure to do so *sua sponte* for plain error. See *Gilliam v. United States,* 707 A.2d 784, 785–86 (D.C.1998) (en banc). In this case, there was no plain error as the jury is unlikely to have convicted Bolanos and Guzman for rape because of evidence of the prior beating rather than because of the compelling evidence of the rape itself.

9. Judge Schwelb also argues that the other crimes evidence could be considered "direct and substantial proof of the charged crime" or "closely intertwined with the evidence of the charged crime." See *(William) Johnson, supra,* 683 A.2d at 1098.

10. See *Ante* at 542 note 4.

evidence of other crimes that is "inextricably intertwined with evidence of the charged offense," may be admitted without a cautionary instruction that the other crimes evidence may not be used for the purpose of proving criminal propensity.[11]

In my view, Judge Schwelb's "vertical *Toliver*" theory, as applied to the facts of this case, is not supported by the reasons we have identified for excluding some evidence of other crimes from *Drew* strictures. In *(William) Johnson,* the en banc court summarized that not all evidence that would support a separate prosecution of an offense other than the one charged is "other crimes" evidence in the sense that it must first be subject to *Drew* analysis and the applicable safeguards before it may be admitted. Specifically, the court stated that the following classes of evidence of other crimes are not subject to *Drew* strictures:

> where such evidence (1) is direct and substantial proof *of the charged crime,* (2) is closely intertwined with the evidence *of the charged crime,* or (3) is necessary to place *the charged crime* in an understandable context.

683 A.2d at 1098 (emphasis added). The reason for treating these classes of evidence differently from traditional "other crimes" evidence is founded on the very concern for prejudice that engendered the *Drew* rule. In other words, when evidence is so closely connected *to the charged offense* that it constitutes direct evidence of that offense or when evidence is necessary to make direct evidence comprehensible to the jury, the risk of prejudice that the jury will use the evidence to convict the defendant for his criminal disposition or bad character, as reflected by commission of another, independent crime, is significantly reduced.[12]

We have no such close connection here between the prior beating and the rape a week later. Evidence of the beating was not direct evidence of the rape and should not, on that score, have been exempted from *Drew* analysis. *Cf. Wilson, supra,* 690 A.2d at 469 (holding that evidence of accused's repeated threats to kill victim less than three days before murder admissible as direct evidence, without *Drew* strictures). Nor is evidence of the prior beating closely intertwined with evidence of the charged crime or necessary to " 'complete the story' " of " 'the charged offense.' " *Id.* at 474 (quoting *Holmes v. United States,* 580 A.2d 1259, 1266 (D.C. 1990)) (citations omitted); *Cf. id.* at 470 n. 3 ("reject[ing] the government's efforts to squeeze the threats evidence ... into the narrow category of 'Toliver' evidence, for which we have required much closer temporal and spatial proximity than shown here.") (citation omitted). As the government candidly explained, the reason for introducing evidence of the prior beating of M.A. in this case was not to describe the circumstances surrounding the charged offense, rape, but rather to explain the complaining witness' subsequent *recantation* of her rape allegation several days later. Thus, here there was not such an intimate connection *between the other crime and the charged crime* required by our cases as would lead us to conclude that the potential for prejudice would be sufficiently mitigated in the mind of the jury as to make *Drew* analysis unnecessary.

As we noted in *(William) Johnson,* the *Drew* rule grew out of a claim of improper joinder. *(William) Johnson, supra,* 683 A.2d at 1096. ("[T]he *Drew* court concluded in relevant part that 'when two crimes arose out of a continuing transaction or the same set of events' [*i.e.,* when joinder would be proper] the danger of admitting evidence of both in

---

11. The standard cautionary instruction states, in relevant part, that the jury is to consider the evidence of other crimes only for the specific purpose (motive, intent, identity, etc.) for which it was admitted, and that the jury is prohibited from considering the evidence of other crimes as evidence "that the defendant has a bad character, or that the defendant has a criminal personality." *See* Criminal Jury Instructions for the District of Columbia, No. 2.51(A) (4th ed. 1996).

12. Even in such circumstances, the *Johnson* court advised that the trial court needs to be alert to the risk of possible prejudice and the need for prophylactic measures, such as the advisability, or indeed necessity in some cases, to give a cautionary instruction. *See (William) Johnson, supra,* 683 A.2d at 1097 n. 10.

one trial is minimized." (citing *Drew, supra,* 118 U.S.App.D.C. at 16, 331 F.2d at 90)). Just as examination of mutual admissibility of evidence is instructive in determining the propriety of joinder, so the propriety of joinder can help answer whether evidence of another crime should be excluded. Here, joinder of the prior beating and the rape would have been improper, even though both incidents involved the same participants, because the offenses are not of "the same or similar character," nor are they "based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan." Super.Ct.Crim.Pro.R. 8(a).

I have previously explained why I believe that, in deciding what safeguards are required for admissibility of evidence of other crimes, we should do so, based not on formulaic notions, but guided by the reason for the *Drew* rule. *See Wilson, supra,* 690 A.2d at 470–76 (Ruiz, J. concurring); *(William) Johnson, supra,* 683 A.2d at 1109–10 (Ruiz, J., concurring). That reason is the acknowledged prejudice inherent in other crimes evidence that is inimical to our fundamental notions of criminal justice. *See Old Chief v. United States,* 519 U.S. 172, 180–85, 117 S.Ct. 644, 650–52, 136 L.Ed.2d 574 (1997). In this case, I see no sound reason to depart from *Drew* analysis.